[No. 45491-9-I. Division One. September 11, 2000.]

CRAIG MCKINNEY, ET AL., *Appellants*, v. THE CITY OF TUKWILA, ET AL., *Respondents*.

---

392

*Mark E. Koontz* (of *Lembhard G. Howell, P.S.*), for appellants.

*Brenda L. Bannon* (of *Keating, Bucklin & McCormack, Inc., P.S.*), for respondents.

WEBSTER, J. — We find that City of Tukwila police officers acted reasonably in carrying out an investigatory stop of Appellants Craig McKinney, his seven-year-old son Ethan, and Anthony Trahan, and thus we affirm summary judgment to all defendants on the Appellants' claims of (1) a violation of 42 U.S.C. § 1983, (2) false arrest, (3) assault and battery, (4) defamation, and (5) violation of Washington's Law Against Discrimination.

## SUMMARY JUDGMENT STANDARD

"When reviewing an order for summary judgment, we engage in the same inquiry as the trial court, and will affirm summary judgment if there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 698, 952 P.2d 590 (1998); *see also* CR 56(c). All facts and reasonable inferences must be considered in a light most favorable to the nonmoving party, and all questions of law are reviewed de novo. *See Wilson Court Ltd. P'ship*, 134 Wn.2d at 698. Questions of fact may be determined on summary judgment as a matter of law where reasonable minds could reach but one conclusion. *See Alexander v. County of Walla Walla*, 84 Wn. App. 687, 692, 929 P.2d 1182 (1997).

## BACKGROUND

In the early afternoon of August 29, 1997, Steve Herrick reported a residential burglary in progress, that the suspect had a gun, that the suspect had hit him in the head with the gun, and that the suspect tried to steal Herrick's car.

Herrick's friend, Robert Milan, chased the suspect and wrestled him to the ground in a nearby park. Tukwila police officers arrived on the scene and apprehended the suspect, Johnny Ray Stewart, at gunpoint.

McKinney, his seven-year-old son Ethan, and Trahan were leaving the city park to get out of harm's way when the police officers apprehended Stewart nearby. Because the victim, Milan, suggested that the Appellants, who were starting to leave, might possibly be involved, one officer ordered other officers to stop the Appellants. Police officers conducted a high-risk investigatory stop of the Appellants: they pointed their service weapons at the Appellants in their car, ordered the adults out of the car and prone to the ground, handcuffed them, and frisked them. After ascertaining that the Appellants were not involved, they were released. The total time that the Appellants were detained was approximately 10 minutes.

Because the evidence concerning the investigatory stop presented in support of and in opposition to summary judgment was relatively brief, we provide relevant portions of the declarations of several of the parties involved.

A. Evidence Offered in Opposition to Summary Judgment

Craig McKinney stated:

> We [McKinney, his son Ethan, and Trahan] were sitting on the grass, when I saw two men, one caucasian and one hispanic, running across the field, approximately fifty yards from where we were sitting, away from where we were sitting. . . .
>
> The two men wrestled on the ground for a short time, and then Tukwila Police Officers arrived with their guns drawn at the two men. . . . The way in which the officers were positioned was such that, should an officer fire a weapon and miss the two men, I would have been in the line of fire.
>
> I was concerned for my safety and Ethan's safety. . . . Anthony, Ethan and I walked at a normal pace to the car, in order to leave the park, where guns were being brandished. We got in the car and began to leave the park. As we were leaving

at a very slow speed, several Tukwila Police Officers surrounded the car, drew their weapons, pointed their weapons at us, and told us to get out of the car, one at a time. Anthony and I were told to lie on our stomachs, while the Tukwila Police Officers handcuffed and frisked us. I complied with the officers' requests.

. . . .

. . . We were detained in handcuffs, in front of the car, in plain view of several people in and around the park. We were released after several minutes.

Clerk's Paper's (CP) at 161-63.

Anthony Trahan's declaration is consistent with McKinney's. CP at 164-66.

Stewart, the perpetrator, stated:

During the several minutes after I was detained by Tukwila Police Officers, Mr. Milan was in my presence and clearly within my eyesight and hearing.

During the several minutes after I was detained by Tukwila Police Officers, I did not hear Mr. Milan state to any Tukwila Police Officer or anyone else that he believed that a white car was involved in the incident; I did not hear Mr. Milan make any statement implying that anyone else may have been involved in the incident.

During the several minutes after I was detained by Tukwila Police Officers, I did not see Mr. Milan making any gesture toward any area of the park indicating that another person or persons were involved in the incident.

During the several minutes after I was detained, I did not hear Mr. Milan tell the police officers that he saw me running toward a white car.

During the several minutes after I was detained by the Tukwila Police Officers, the officers did not ask me if there was anyone else involved in the incident.

During the several minutes after I was detained by the Tukwila Police Officers, the officers did not ask me if there was a white car involved in the incident.

CP at 167-68.

At Stewart's criminal trial, Milan testified as follows in

response to defense counsel's questions:

Q. Okay. Do you recall when the police arrived, you pointed to another car?

A. Yes, I do.

Q. And you believe that potential suspect [sic] was in the car that was leaving the park?

A. I said it could have been possible.

CP at 174.

B. Statements by the Officers Who Received and Relayed the Information That Appellants Were Potentially Involved

Officer Timothy Hogan stated:

As Officer Lund and myself were interacting with victim Milan, Milan blurted out that the white vehicle in the parking lot adjacent to Foster Park was possibly involved with suspect Stewart. He communicated to us generally that Stewart had been running directly across the park towards the white vehicle.

. . . Because the semi-automatic handgun had not yet been located, officer and public safety was of paramount concern. Rather than delay and possibly allow a getaway car to leave the scene undetected, I immediately relayed over my portable police radio that in the parking lot at the south end of the park was a white car supposedly associated. I told all available units that I needed someone to contact that car.

CP at 43. Hogan also stated that he did not know the race of the Appellants when he made the request that they be stopped. CP at 345.

Officer Sean Robertson stated:

Victim Robert Milan was very agitated, upset, and out of breath. He had just been fighting with suspect Stewart. He hurriedly told us that the white car in the adjacent parking lot was with Stewart. He generally indicated to us that the white car was involved, and asked us to stop those guys. Because of his extremely agitated state, having just been fighting with Johnny Ray Stewart, it was difficult to get Milan to focus.

Because of the extremely dangerous nature of the crimes

that we were investigating, the exigencies of the situation, and the fact that the white car indicated by Milan was now leaving the parking lot, it was necessary to investigate that white car.

As I yelled across the park for the car to "stop", Officer Tim Hogan broadcast over his portable police radio that the white car in the parking lot was possibly involved in our investigation, and requested that available police units contact the white car.

CP at 50.

Officer Eric Lund stated:

The victim, Robert Milan, was extremely agitated and excited when we spoke with him. He immediately began pointing at a white car that was in the parking lot immediately adjacent to Foster Park. He communicated to us that Stewart was somehow connected to the white car which was now leaving the parking lot.

CP at 46-47.

Officer Peter Horvath stated:

Mr. Milan blurted out that Stewart had been running directly across the park, towards the white vehicle, which was parked in the lot. Milan generally communicated his belief that the white vehicle that was now leaving the parking lot of the park might be Stewart's getaway car. Milan stated that as Stewart ran towards the car, the car started up; when he caught up to Stewart and attempted to detain him, the vehicle began to leave the parking lot.

CP at 53.

## C. Statements by Officers Who Stopped the Appellants

Officer Jon Harrison stated:

Given the circumstances as relayed to us via police radio, we believed that the occupants of the car were armed and dangerous, and that a high risk investigatory stop with weapons drawn was necessary to neutralize the situation, to secure our safety, and to secure the safety of any innocent bystanders. . . .

I recall that there were three occupants in the vehicle, including one child.

. . . I took a position of cover behind my patrol car door. My duty weapon was drawn. . . .

We removed the two adult Plaintiffs from the vehicle one at a time with their hands up. . . . My duty weapon was drawn until I approached and cleared the vehicle—ensuring there were no suspects in the car. After I holstered my duty weapon, the juvenile Plaintiff was assisted out of the vehicle.

. . . As soon as I determined that the Plaintiffs were not involved . . . the two adults were released from handcuffs, and they were all free to go.

. . . .

I believe that the Plaintiffs were only stopped and detained at their car for approximately ten minutes.

CP at 133-35.

Officer Michael Murphy stated:

The Plaintiffs' car stopped in response to our approaching lights and siren. We ordered the Plaintiffs out of the car at gun point. I stood approximately two car lengths away from the Plaintiffs. My duty weapon was in the 'low ready' position. Officer Harrison issued his commands first to the driver, and then to the adult passenger. I took control of one of the adult Plaintiffs. As I approached the Plaintiff for handcuffing, I holstered my duty weapon. I had him situated prone on the ground, placed him in handcuffs, and frisked him for weapons to neutralize any safety concerns. Once both adults were out of the car, the car was checked for additional suspects. The juvenile Plaintiff was not removed at gun point. The Plaintiffs were never arrested.

Soon after the Plaintiffs were removed from the car we learned from the plaintiffs and from the on-scene police officers that the car and the Plaintiffs were not involved in the burglary and carjacking/robbery with a weapon. They were immediately released and free to go.

CP at 129.

Officers Harrison and Murphy stated that they were unaware of the race of the Appellants when they received the request to stop the Appellants and when they initiated the stop. CP at 337-38, 339-40.

D. Seven-Year-Old Ethan

The Appellants assert that an issue of fact exists concerning whether the officers pointed a gun directly at Ethan. Taking the evidence in the light most favorable to the Appellants, we assume for the purposes of summary judgment that when the officers surrounded the vehicle with weapons pointed at the Appellants, a gun was pointed directly at seven-year-old Ethan. There is no evidence that the officers pointed a gun in the direction of the child once the adults were out of the car.

ANALYSIS

I. 42 U.S.C. § 1983

42 U.S.C. § 1983 provides that any person acting under color of state law who deprives a citizen of his or her constitutional rights may be held liable for damages. Appellants claim under section 1983 that the officers violated their Fourth Amendment right to be free from unreasonable search and seizure. Their argument that the seizure here was unreasonable is twofold: first, they argue that the officers lacked the required reasonable suspicion to make the investigatory stop, and second, they claim that the officers' use of force in carrying out the stop was unreasonable.

A. Appellants' Excessive Force Argument is Not Barred

As an initial matter, the officers argue that Appellants' claim of excessive force as a separate claim under section 1983 is barred because it was not pleaded or argued in Appellants' brief opposing summary judgment. They point to RAP 9.12, which states that the appellate court reviewing an order for summary judgment will consider only the evidence and issues brought to the attention of the trial court, and argue that under CR 56(c) the trial court's summary judgment determination is limited to the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Appellants respond that the excessive force argument is reviewable under RAP 9.12 because it

was brought to the attention of the trial court at oral argument. Report of Proceedings (RP) at 24-25.

■ We review the excessive force argument. It appears to us that the argument by Appellants is made not as a separate claim but is presented as a ground for finding that the seizure here was unreasonable under the Fourth Amendment.[1] The issue was raised at oral argument and the trial court specifically addressed it: "I do not think it could be said that no reasonable jury would find that the conduct here was unreasonable and so I think it is a jury question as to whether or not a reasonable officer would have believed that it was lawful to use weapons and require the plaintiffs to get out of their car and handcuff them and so forth."[2] RP at 39. Furthermore, the Appellants alleged in their complaint the facts upon which they argue, that is, that the officers pointed their weapons at them, ordered them prone to the ground, handcuffed them, and frisked them. CP at 4-5. Moreover, in their brief to the trial court they argued under their claim of false arrest that even if the initial stop were justified, the scope of the intrusion was unreasonable where the physical intrusion was substantial and unjustified. CP at 147-48. Later, in arguing their section 1983 claim, they referred to the argument appearing in the false arrest section.

## B. The Officers Are Entitled to Qualified Immunity

■ ■ The officers claim qualified immunity from suit under section 1983. Whether an officer is entitled to qualified immunity in a section 1983 action for an allegedly unlawful act "generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S. Ct.

---

[1] "[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

[2] The trial court later decided to grant summary judgment on these issues.

2727, 73 L. Ed. 2d 396 (1982)). A right is clearly established if the "contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The relevant question where an officer allegedly violated the Fourth Amendment is whether a reasonable officer could have believed that the actions taken were lawful under the Fourth Amendment in light of clearly established law and the information the acting officer possessed at the time. *See id.* at 641.

■ An investigatory detention is reasonable and permissible under the Fourth Amendment if the officers can point to "specific and articulable facts" giving rise to a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997). Under *Terry*, an officer may frisk the detainee for weapons if the officer has reasonable grounds to believe that the detainee is armed and presently dangerous. *See* 392 U.S. at 27.

### 1. *The Initial Stop*

■ Turning to the present case, we must first ask whether a reasonable officer could have believed that it was lawful to stop the Appellants where the victim stated that they might be involved in the incident being investigated, reportedly a felony involving an armed suspect, and the Appellants were leaving the scene. To ask the question is to answer it. In *State v. Randall*, 73 Wn. App. 225, 228-29, 868 P.2d 207 (1994), the court held that "where an investigatory stop is based on information given the detaining officer by another person, the stop is valid if under the totality of the circumstances the officer has a reasonable suspicion that the [detainee] was engaged in criminal activity." One factor in the totality of the circumstances is the nature of the suspected crime. *Id.* The court reasoned:

> An officer acting on a tip involving the threat of violence and rapidly developing events does not have the opportunity to

undertake a methodical, measured inquiry into whether the tip is reliable, as does an officer acting on a tip that a nonviolent offense such as possession of drugs has been committed, or an officer seeking a search warrant based on a tip. Rather, when acting on a tip that a violent offense has just been committed, as here, the officer must make a swift decision based upon a quick evaluation of the information available at the instant his or her decision is made. To require an officer under these circumstances to stop and undertake an in-depth analysis of the reliability of the information received by the police dispatcher would greatly impede the officer's discharge of duty and would greatly increase the threat to the public safety.

*Id.* at 230 (citations omitted). Here, the officers who received the information from the victim and the officer who relayed the order to stop the Appellants acted reasonably where a victim reported that the individuals in the white car might be involved.[3] The white car was leaving and the officers had to act quickly. Furthermore, the officers who effectuated the stop acted upon the information available to them at the time and under an order relayed from their fellow officer who apprehended the suspect and was with the victim. Where the decision to stop the Appellants was based on reasonable suspicion, those officers actually conducting the stop were entitled to rely on the decision made by fellow officers. *See United States v. Hensley*, 469 U.S. 221, 231-32, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). We find that a reasonable officer could have believed that it was lawful to stop the Appellants under clearly established law and the circumstances here.

### 2. *The Force Used to Effect the Stop*

■■ ■■ Whether an officer used excessive force in making an investigatory stop is also analyzed under the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 388, 395-96, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Determining whether the force

---

[3] We do not think that Stewart's declaration creates an issue of material fact concerning whether Milan made a statement to the officers concerning the Appellants because his declaration establishes only that he did not *hear* any such statement.

used to carry out an investigatory stop was reasonable under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion . . . against the countervailing governmental interests at stake." *Id.* at 396 (citation and internal quotation marks omitted). Reasonableness is measured "from the perspective of a reasonable officer on the scene," not with 20/20 hindsight. *Id.* Fourth Amendment jurisprudence recognizes that the right to make an investigatory stop necessarily permits the officer the right to use "some degree of physical coercion or threat thereof to effect it." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Here, we conclude that the Appellants have not demonstrated that a reasonable officer would view the actions taken by the Tukwila officers as unlawful under the Fourth Amendment in light of clearly established law and the information the acting officers possessed at the time. *See Anderson*, 483 U.S. at 641. Officers are "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235 (finding that an officer approaching an individual with his service revolver drawn and pointed into the air was well within the permissible range of a *Terry* stop where the individual was wanted for investigation due to possible involvement in an armed robbery and was reported to be armed and dangerous). In *State v. Belieu*, 112 Wn.2d 587, 605, 773 P.2d 46 (1989), the court concluded that officers' use of drawn guns was permissible in an investigatory stop where the officers reasonably feared for their safety.[4] In *Belieu*, officers received a radio dispatch describing men suspected of casing homes

---

[4] The court declined to consider whether the combined use of drawn weapons, frisking and handcuffing exceeded the permissible scope of a *Terry* stop because the subsequent actions were justified by events unfolding during the stop. *See State v. Belieu*, 112 Wn.2d 587, 605, 773 P.2d 46 (1989).

for burglary in an area where weapons had been stolen in a series of earlier burglaries. *See id.* at 588-89. The officers observed two men, one of whom matched one of the descriptions, walk toward a parked automobile, then turn and walk away. *See id.* at 589-90. A few minutes later, the men were spotted running back toward the automobile. *See id.* at 590. Individuals in the car made furtive movements. *See id.* When the car started down the street, the officers stopped the individuals in the automobile with weapons drawn and pointed at the automobile. *See id.* at 590-91. *See also United States v. Taylor*, 716 F.2d 701, 707-09 (9th Cir. 1983) (finding that an officer's actions in approaching a suspect with gun drawn and pointed at the suspect, ordering the suspect to the ground, and handcuffing and frisking the suspect were within the bounds of a *Terry* stop where the officers had valid reason to fear for their safety); *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) (holding that an officer's conduct in drawing his gun, ordering a suspect to the ground, and handcuffing and frisking him, even where the suspect cooperated fully, was permissible in an investigatory stop of an armed bank robbery suspect).

In light of the above case law, we find that the impropriety of the officers' actions here is not clearly established. We thus find that the officers are entitled to qualified immunity from suit under section 1983.

### C. The Appellants' Section 1983 Claim Against the City

A municipality may be held liable for section 1983 damages only where the plaintiff identifies a municipal policy or custom that caused the plaintiff's injury. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). Here, the Appellants identify no policy or custom other than asserting that the officers' actions were unreasonable and that they were acting in accordance with police department procedures. But as we shall see below, *infra* section II, we conclude that the officers' conduct in making and carrying out the stop

was reasonable under the circumstances; thus, the City may not be held liable under section 1983.

## II. False Arrest

"The gist of an action for false arrest . . . is the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority." *Bender v. City of Seattle*, 99 Wn.2d 582, 591, 664 P.2d 492 (1983). We need not determine whether the Appellants were restrained for purposes of stating a false arrest claim because we find that the officers are entitled to state law qualified immunity.

State law qualified immunity rests on a different analysis than does qualified immunity under section 1983. *See Staats v. Brown*, 139 Wn.2d 757, 779, 991 P.2d 615 (2000). An officer has state law qualified immunity from suit for false arrest where the officer " '(1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors, and (3) acts reasonably.' " *Id.* at 778 (quoting *Guffey v. State*, 103 Wn.2d 144, 152, 690 P.2d 1163 (1984)).

These three requirements for state law qualified immunity are met in the present case. First, police officers in general act under statutory authority to enforce the state criminal laws. *See* RCW 10.93.070. Second, Appellants argue under their section 1983 claim against the City that the officers acted in accordance with department procedures. Finally, we conclude that the officers acted reasonably under the circumstances. The initial stop was reasonable because a victim indicated that the Appellants might be involved with a felony suspect and the Appellants were leaving the scene. Moreover, we find that the officers' actions in effecting the stop were reasonable. Examined from the perspective of the officer at the scene, the outcome of the rapidly unfolding felony investigation was uncertain, and the officers were justified in being concerned for their

safety. The Appellants argue that it was illogical for the officers to conclude that the Appellants were armed because there was no opportunity for the suspect to give the unrecovered weapon reportedly used in the felony to the Appellants. But it does not appear to us that the Respondents suggest that the officers believed that the Appellants might have possession of the suspect's weapon; rather, the officers assumed, upon information that the Appellants might be involved with the suspect, that they might also be armed. We think that officers investigating an armed felony are not unreasonable in taking the precaution of assuming that potential accomplices might be armed. Therefore, we do not think that approaching with weapons drawn, ordering the adult Appellants to the ground, handcuffing them, and frisking them was unreasonable under the circumstances. Although the experience was no doubt frightening and humiliating for the Appellants, the duration of the time handcuffed and on the ground was relatively short. There is no allegation that the officers subjected the Appellants to unnecessarily rough treatment. No one was physically injured. We conclude that the officers are entitled to state law immunity from suit for false arrest.

 Furthermore, apart from immunity, the Appellants have not established an action for false arrest because the officers' actions were reasonable under *Terry* and therefore authorized. Thus, the Appellants have no claim against the City under the theory of respondeat superior.

### III. Assault and Battery

A battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 9, at 39 (5th ed. 1984). An assault is any act of such a nature that causes apprehension of a battery. *See* Keeton § 10, at 43.

 Having found above that the officers' use of force

was reasonable, we find that they are entitled to state law qualified immunity for the assault and battery claims. *See Guffey*, 103 Wn.2d at 153 (finding an officer immune from liability for assault).[5] Furthermore, because we found that the officers' use of force was reasonable, the assault and battery claims against the Respondents fail because the touching was lawful.

## IV. Defamation

■■ ■■ "When a defendant in a defamation action moves for summary judgment, the plaintiff has the burden of establishing a prima facie case on all four elements of defamation: falsity, an unprivileged communication, fault, and damages." *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989). Here, where the plaintiffs are private figures, they need show only negligence to establish fault. *See id.* "The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *Id.*

The Appellants argue that conduct may constitute a publication.[6] They assert that the officers' conduct—stopping the Appellants at gunpoint, handcuffing, frisking, and detaining them—communicated to others in the park that the Appellants were involved in criminal activity. The Appellants claim they suffered humiliation, harm to their reputations, and emotional distress as a result of the officers' conduct.

The City responds that no publication occurred. It argues that an expansion of defamation to include the officers'

---

[5] Although state qualified immunity does not shield an officer for assault and battery claims arising out of the use of excessive force, *see Staats v. Brown*, 139 Wn.2d 757, 780, 991 P.2d 615 (2000), that is not the case here.

[6] Appellants point to the definition and comments for the "meaning" of a communication in the Restatement (Second) of Torts § 563 (1965): "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." The comment implies that a matter may be communicated by some method other than spoken or written words. *See* section 563 cmt. a.

conduct here would subject law enforcement to defamation suits every time an investigatory stop was made and the individuals stopped are determined to be innocent of any illegal activity.

But we need not approach the question of publication because the Appellants have failed to demonstrate that the officers' conduct was negligent. As discussed above, the officers' conduct was reasonable under the circumstances; thus, the officers cannot be said to have acted negligently.

### V. Washington Law Against Discrimination

■■■ Appellants claim the officers' conduct violated their right under Washington's Law Against Discrimination (WLAD) to be free from discrimination based on race and their "right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." RCW 49.60.030(1)(b). The law prohibits such discrimination in a place of public accommodation. *See* RCW 49.60-.215.[7] The Appellants, African-Americans, argue that they were discriminated against on the basis of their race because the officers were white and white people in the park were not detained.

But an action for discrimination under RCW 49.60.215 requires a showing that the unequal treatment was *motivated* by race. See *Evergreen Sch. Dist. No. 114 v. Human Rights Comm'n*, 39 Wn. App. 763, 773, 695 P.2d 999 (1985). Here, the Appellants have not presented any evidence to show that the officers' conduct was motivated by race. The

---

[7] RCW 49.60.215 states:

It shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, or the requiring of any person to pay a larger sum than the uniform rates charged other persons, or the refusing or withholding from any person the admission, patronage, custom, presence, frequenting, dwelling, staying, or lodging in any place of public resort, accommodation, assemblage, or amusement, except for conditions and limitations established by law and applicable to all persons, regardless of race, creed, color, . . . .

officers stated that they stopped the Appellants because of the information provided by the victim. There is no evidence that the officer requesting that the car be stopped knew when he made the request that the occupants of the vehicle were African-Americans. The simple fact that other people in the park who were not detained were white does not show that the officers detained the Appellants because they were African-American. We find that the Appellants have failed to defeat summary judgment on a WLAD claim against the officers or the City.

## CONCLUSION

We affirm the trial court's order granting summary judgment in favor of all Respondents on all claims.

BAKER, J., and HOWARD, J. Pro Tem., concur.