James Tracey MILLER,
Plaintiff–Appellant,

v.

CLARK COUNTY; Edward J. Bylsma, in his capacity as a police officer for Clark County and as an individual, Defendants–Appellees.

No. 02–35558.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 2003.

Filed Aug. 21, 2003.

John R. Muenster, Muenster & Koenig, Seattle, WA, for the plaintiff-appellant.

Dennis M. Hunter, Clark County Prosecuting Attorney's Office, Vancouver, WA, for the defendant-appellee.

Before ALARCÓN, GOULD, and CLIFTON, Circuit Judges.

GOULD, Circuit Judge.

We consider whether a sheriff's deputy violated a criminal suspect's Fourth Amendment right to be free from unreasonable seizures by ordering a trained police dog to "bite and hold" the suspect until officers arrived on the scene less than a minute later. Because we conclude that the officer's use of the dog here did not violate the suspect's Fourth Amendments rights, we affirm the district court's judgment.

## I

A Clark County Sheriff's Deputy was on routine patrol on the night of January 21, 2001, when he became suspicious of the driver of a silver Pontiac Fiero.[1] The deputy had conducted a computerized check and discovered that the Fiero bore a license plate registered to a different vehicle. Because the switched license plate constituted a traffic infraction and was evidence that the vehicle might have been stolen, the deputy turned on his emergency overhead lights and siren to signal the driver to pull over. The driver, later determined to be James Tracey Miller (the plaintiff in this action), refused.

At the entrance to a long driveway, the driver slowed the Fiero, and a passenger exited. The deputy pursued the passenger, while the driver drove the Fiero up the driveway unpursued. The deputy called for backup.

Soon thereafter, one of the defendants, Sheriff's Deputy Edward Bylsma, arrived with his police dog "Kimon." Deputy Bylsma and the dog walked up the long driveway and found the Fiero, now unoccupied, in front of a house. Deputy Bylsma learned that the plaintiff Miller lived in the house with his parents and that Miller was wanted by police for the felony of attempting to flee from police by driving a car with a wanton or willful disregard for the lives of others. Deputy Bylsma was told by other deputies that the house's residents were not "law enforcement friendly" and that a "10–96," a mentally ill person, lived there. He was told that Miller had been seen running away from the house a few minutes earlier. Deputy Bylsma saw a seven or eight-inch knife on the Fiero's seat.

Deputy Bylsma, along with another deputy and the police dog, tracked Miller across Miller's parents' large rural property. Deputy Bylsma, the other deputy, and

---

1. Our rendition of the facts is taken from the district court's factual findings after trial of the excessive force claim.

the dog passed through underbrush, over electric fences, and across a field before arriving at some dense, dark, wooded terrain. The search party paused, and Deputy Bylsma yelled: "This is the Sheriff's Office. You have five seconds to make yourself known, or a police dog will be sent to find you." There was no response. Deputy Bylsma then let the dog off his leash and gave the dog a command that directed the dog to search for the suspect and detain him by biting his arm or leg. Deputy Bylsma watched the dog enter the woods and heard the dog breaking through the underbrush, as if "working the scent." About one minute later, Deputy Bylsma heard Miller scream. Deputy Bylsma immediately ran into the woods in the direction of the scream. Because it was dark and the woods were unfamiliar to him, it took Deputy Bylsma between forty-five and sixty seconds to arrive at a location from which he could see Miller. Deputy Bylsma saw that Miller was unarmed and that the police dog was biting Miller's upper arm. Deputy Bylsma ordered the dog to release Miller, and the dog promptly complied.

Miller was arrested and taken to the hospital with a severe injury. Miller's skin was torn in four places above the elbow, and the muscles underneath were shredded. Miller's biceps muscle was "balled up" in the antecupital space. His brachialis muscle—the muscle closest to the bone and alongside the brachialis artery—was torn. Miller's injury went as deep as the bone. He underwent surgery by an orthopedic surgeon and spent several days in the hospital. Miller continues to suffer lingering effects from the dog bite.

Deputy Bylsma's police dog is a specially trained German Shepherd. The dog is trained to "bite and hold" a suspect's arm or leg until Deputy Bylsma orders the dog to release. The dog bites with a force of 800 to 1,200 pounds per square inch, and the longer the dog bites, the more severely a suspect will be injured. Ordinarily, the dog bites a suspect for only about four seconds before Deputy Bylsma orders the dog to release. Here, however, the dog bit Miller for between forty-five and sixty seconds, because it took Deputy Bylsma that long to locate Miller and confirm that the dog could release him without posing a threat to officers.

Miller filed this action against Deputy Bylsma and against Clark County under 42 U.S.C. § 1983 alleging that Deputy Bylsma's use of the police dog in these circumstances constituted excessive force in violation of Miller's Fourth Amendment right to be free from unreasonable seizures. Before trial, the district court granted the defendants partial summary judgment on one Fourth Amendment issue, holding that Deputy Bylsma's use of the police dog did not constitute "deadly force." After a bench trial, the district court entered judgment in favor of both defendants, holding that Deputy Bylsma's use of the dog was not unreasonable "excessive force" under the circumstances.[2] Miller appeals.

## II

■ The use of force to effect an arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To determine whether Deputy Bylsma's use of the police dog to "bite and hold" Miller was an unconstitutional unreasonable seizure, we first consider whether Deputy Bylsma's use of the dog constituted "deadly force"— a category of force that is reasonable only

2. Miller also asserted two state-law tort claims, and the district court ruled for the defendants on those claims.

in special circumstances.[3] Because we are reviewing the district court's grant of partial summary judgment to the defendants on the deadly force issue, we must determine, viewing the evidence presented on the summary judgment motion in the light most favorable to Miller,[4] if there is a genuine issue of material fact as to whether Deputy Bylsma used deadly force. *See Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002).

Deadly force means force reasonably likely to kill. *Vera Cruz v. City of Escondido*, 139 F.3d 659, 660 (9th Cir.1997).[5] To be characterized as deadly, force must present "more than a remote possibility" of death in the circumstances under which it was used. *Id.* at 663. We have held that an officer's ordering a police dog to bite a suspect does not pose more than a remote possibility of death in most circumstances. *Brewer v. City of Napa*, 210 F.3d 1093, 1098 (9th Cir.2000) ("[T]he *Garner* analysis with respect to deadly force generally does not apply to the use of police dogs.").[6] Notwithstanding this general rule, we have never before had occasion to determine whether an officer's ordering a

police dog to bite a suspect's arm or leg *and permitting the dog to continue biting for up to one minute,* an unusually long bite duration, poses more than a remote possibility of death. Viewing the facts in the light most favorable to Miller, we conclude that such a seizure does not pose more than a remote possibility of death.

Kimon, the German Shepherd that bit Miller, bites with up to 1,200 pounds per square inch of pressure—pressure roughly comparable to that exerted by a car tire running over a body part. Although Kimon is trained to bite a suspect's arms and legs, Deputy Bylsma admitted it is "possible" the dog could bite a suspect's head or neck if that body part presented itself most readily.

Even if Kimon avoids a suspect's head and neck, and bites a suspect's arm or leg, as the dog is trained to do, his bite may pose some modest threat to a suspect's life. One of Miller's expert witnesses, Dr. Craig Eddy, a surgeon, submitted an affidavit opining that "[a] dog with the wound-inflicting capability of the dog that bit Mr. Miller is capable of lacerating arteries in

---

**3.** If Deputy Bylsma's use of the police dog constituted "deadly force," then his actions are judged under the standard of *Tennessee v. Garner*, 471 U.S. 1, 3, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (holding that deadly force is appropriate only if an officer has probable cause to believe that a suspect poses a significant threat of death or serious physical injury to the officer or others). If, on the other hand, Deputy Bylsma's use of the police dog did not constitute deadly force, then his actions are judged under the less rigorous standard of *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (identifying factors relevant to whether force was excessive).

**4.** On this issue, therefore, we consider not the facts as found by the trial court after trial but rather the version of the facts presented by the parties before the court ruled on the partial summary judgment motion.

**5.** Miller urges that our *Vera Cruz* decision should be overturned and that force creating

"a substantial risk of causing death *or serious bodily injury*" should be deemed deadly force. Even if *Vera Cruz* were wrongly decided, we still would be required to follow its holding. *See, e.g., Branch v. Tunnell*, 14 F.3d 449, 456 (9th Cir.1994).

**6.** *See also Vera Cruz*, 139 F.3d at 663 (affirming the district court's refusal to instruct the jury on deadly force when the plaintiff failed to present evidence that a trained police dog's bite posed a substantial threat of death); *Quintanilla v. City of Downey*, 84 F.3d 353, 358 (9th Cir.1996) (same); *Fikes v. Cleghorn*, 47 F.3d 1011, 1014–15 (9th Cir.1995) (same); *Chew v. Gates*, 27 F.3d 1432, 1442–43 (9th Cir.1994) (declining to decide whether an officer's ordering a police dog to bite a suspect constituted "deadly force" but noting, in dicta, that such force "at the very least approaches deadly proportions").

the arms or legs, resulting in death due to exsanguination." This expert opined that a suspect could die in a few minutes if a dog happened to bite a suspect's arm or leg in the wrong place, severing a critical artery, and if the suspect were then permitted to bleed to death.

Deputy Bylsma testified at his deposition that the longer a dog is permitted to bite a suspect, the greater the likelihood the suspect will be injured severely.

Even if it is "possible" that Kimon could bite a suspect's head or neck, that Kimon is "capable" of lacerating arteries that could result in a suspect's bleeding to death, and that Kimon injures a suspect more seriously the longer he bites, we still conclude that Deputy Bylsma did not use deadly force when he caused Kimon to bite Miller for up to sixty seconds. Such mere "possibilities" and "capabilities" do not add up to a "reasonable probability." Even when we credit Miller's evidence, as we must at this stage, the risk of death from a police dog bite is remote. We reiterate that the possibility that a properly trained

police dog could kill a suspect under aberrant circumstances does not convert otherwise nondeadly force into deadly force. *See Vera Cruz*, 139 F.3d at 663. Miller has not presented evidence that he was subjected to "more than a remote possibility of death," *see id.*, so we affirm the district court's partial summary judgment on the deadly force issue.[7]

### III

Having concluded that Deputy Bylsma's use of the police dog did not constitute "deadly force," we now consider whether his use of the police dog nonetheless constituted unreasonable "excessive force" under the Fourth Amendment. The district court, after a bench trial, concluded that Deputy Bylsma's use of the police dog did not constitute excessive force. Reviewing the district court's factual findings for clear error and its legal conclusions de novo, *see Dubner v. City and County of San Francisco*, 266 F.3d 959, 964 (9th Cir.2001), we agree with the district court's conclusions and affirm its judgment.[8]

---

7. Dr. Eddy as an expert witness for Miller further opined in his affidavit that "[a]llowing a police dog ... to bite a human being on the extremities, without immediate restraint, constitutes the use of deadly force" and that "the force and location of the dog bite wounds[here] had a reasonable probability of causing Mr. Miller's death." Without expressing disrespect for the genuineness of Miller's expert's opinions, we conclude that these statements do not create a genuine issue of material fact as to whether Deputy Bylsma's ordering the dog to bite Miller constituted deadly force. First, the expert's opinion that the bite constituted "deadly force" is a legal conclusion, not a medical conclusion, and we are not bound by a witness's opinions about the law. *See, e.g., Mukhtar v. Calif. State Univ.*, 299 F.3d 1053, 1066 n. 10 (9th Cir.2002). Second, the expert's opinion that the "force and location of the dog bite wounds [here] had a reasonable probability of causing Mr. Miller's death" is of limited relevance because, "[i]n judging whether force is

deadly, we do not consider the result in a particular case—be it that the suspect was killed or injured—but whether the force used had a reasonable probability of causing death." *Vera Cruz*, 139 F.3d at 663. In this sense, Miller's expert Dr. Eddy addressed the wrong question. Even if Miller's wounds eventually proved severe, Deputy Bylsma's deployment of the police dog, viewed objectively from the perspective of a reasonable officer on the scene, did not have a reasonable probability of causing Miller's death.

8. We have reviewed the record and the district court's factual findings, and we cannot say that any of the district court's factual findings are clearly erroneous. *See Easley v. Cromartie*, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (holding that clear error exists only when the appeals court has a "definite and firm conviction that a mistake has been committed."). All of the district court's factual findings are amply supported by the record.

■ In determining the reasonableness of a seizure effected by non-deadly force, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing government interests at stake." *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (internal quotations omitted). Our analysis proceeds in three steps. First, we assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted. *Chew,* 27 F.3d at 1440. Second, we assess the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (internal quotations omitted). Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable. *See Headwaters Forest Defense v. County of Humboldt,* 240 F.3d 1185, 1199 (9th Cir.2000) (judgment vacated and case remanded for further consideration in light of *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), by *County of Humboldt v. Headwaters Forest Defense,* 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001)) (judgment reaffirmed after remand by *Headwaters Forest Defense v. County of Humboldt,* 276 F.3d 1125, 1127 (9th Cir.2002)).

### A

■ We begin our analysis of the excessive force issue by evaluating the district court's appraisal of the type and amount of force inflicted. The district court found that the force used to seize Miller, though not deadly, was "considerable" and was "exacerbated by the duration of the bite."

Although the police dog was trained to bite and hold a suspect's arm or leg, not to maul a suspect, Deputy Bylsma permitted the dog to bite and hold Miller for an unusually long time period, an action that might cause a suspect pain and bodily injury. *Cf. Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.1998) (holding that "excessive duration of the bite ... could constitute excessive force"); *Chew,* 27 F.3d at 1441 ("By all accounts, the force used to arrest Chew was severe. Chew was apprehended by a German Shepherd taught to seize suspects by biting hard and holding."). We conclude that the intrusion on Miller's Fourth Amendment interests was a serious one.

### B

We next assess the importance and legitimacy of the government's countervailing interests, mindful of the three factors the Supreme Court identified in *Graham* as pertinent to this inquiry:

*First,* to understand the government's interest we must consider the severity of Miller's crimes. Miller was wanted not only for a misdemeanor traffic infraction (mismatched license plates), but also for a prior felony. The government has an undeniable legitimate interest in apprehending criminal suspects, *see United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (referring to "the strong government interest in solving crimes and bringing offenders to justice"), and that interest is even stronger when the criminal is, like Miller, suspected of a felony, which is by definition a crime deemed serious by the state. This factor strongly favors the government.

*Second,* we consider whether Miller threatened officers' safety—which we have viewed as the most important of the three *Graham* factors. From Deputy Bylsma's

viewpoint,[9] Miller posed an immediate threat to officers' safety. Deputy Bylsma knew that Miller had defied orders to stop. Deputy Bylsma knew that Miller was a felony suspect wanted for the crime of attempting to flee from police by driving a car with "a wanton or willful disregard for the lives ... of others," Rev.Code Wash. § 46.61.024, a crime that evinces a willingness to threaten others' safety in an attempt to escape responsibility for past crimes.[10] Deputy Bylsma knew that Miller had possessed a large knife moments earlier, a fact that suggests Miller had a propensity to carry a weapon (and perhaps a weapon more lethal than the one he had left behind).[11] Deputy Bylsma knew that there was a chance Miller was not "law enforcement friendly." Deputy Bylsma knew that there was a chance Miller had mental health problems.

Perhaps more importantly, Deputy Bylsma knew that if Miller's defiant and evasive tendencies turned violent, and Miller staged an ambush, Miller would possess a strategic advantage over the deputies. Deputy Bylsma suspected that Miller was hiding in the woods, but he did not know where within those woods Miller was hiding. Deputy Bylsma knew that it was night and that the woods were dark. He knew that the terrain was treacherous, strewn with (as the district court put it) "unseen obstacles obscured by darkness." He knew that Miller—unlike the deputies—was familiar with the terrain and that Miller might have seized the opportunity to select a hiding place to maximize Miller's strategic advantage. Deputy Bylsma did not know whether Miller was armed. He knew that Miller remained defiant, having ignored Deputy Bylsma's warning that he was about to release a police dog. Under these objectively menacing circumstances, Deputy Bylsma was entitled to assume that Miller posed an immediate threat to his and to the other deputy's safety. *See Menuel v. City of Atlanta,* 25 F.3d 990, 995 (11th Cir.1994) (from the viewpoint of an officer confronting a dangerous suspect, "a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death"). Given the gravity of the risk to law enforcement, with Miller hiding in the shadows, this second *Graham* factor weighs heavily in the government's favor.

*Third,* we consider whether Miller was actively resisting arrest or attempting to evade arrest by flight. Although Miller had paused while hiding in the woods at

---

9. We evaluate the reasonableness of Deputy Bylsma's use of force based on his "contemporaneous knowledge of the facts." *See Deorle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir.2001).

10. Even if Miller were wanted only for a nondangerous felony, we still would deem it significant—though of limited significance—that Miller was a felony suspect. *See Chew,* 27 F.3d at 1442 ("[I]n view of the fact that the record does not reveal the *type* of felony for which Chew was wanted, the existence of the warrants is of limited significance.").

11. Miller suggests that in *Robinson v. Solano County,* 278 F.3d 1007 (9th Cir.2002) (en banc), we held that, in assessing the dangerousness of a fleeing suspect, a police officer may put no weight on the fact that the suspect previously possessed a weapon. Rather, we held in *Robinson* that the mere fact that a fleeing suspect had previously possessed a weapon, without more, was insufficient by itself to justify the seizure there effected. *See id.* at 1014 ("The *only* circumstances in this case favoring the use of force was the fact that plaintiff had earlier been armed with a shotgun that he used to shoot the neighbor's dogs. We conclude that Robinson's earlier use of a weapon, that he clearly no longer carried, is insufficient to justify the intrusion on Robinson's personal security.") (emphasis added). Here, by contrast, Miller's earlier possession of the knife was one of many circumstances that favored the use of force, and, unlike in *Robinson,* officers could not see that Miller was unarmed at the time of the seizure.

the time of his arrest, Miller was still evading arrest by flight. *See Chew*, 27 F.3d at 1442. This factor favors the government. *Id.*

All three *Graham* factors favor the government. But that does not end our inquiry.

## C

Mindful of both the serious intrusion on Miller's Fourth Amendment interests caused by the dog bite, and the strong countervailing government interests in safely arresting Miller, we must now consider the dispositive question whether the force that was applied was reasonably necessary under the circumstances. We conclude that it was reasonably necessary.

Although the government need not show in every case that it attempted less forceful means of apprehension before applying the force that is challenged, we think it highly relevant here that the deputies had attempted several less forceful means to arrest Miller, including: signaling to Miller with emergency lights and siren to stop his vehicle; pursuing Miller's vehicle in a police cruiser; pursuing Miller on foot; and audibly warning Miller to surrender or be chased by a police dog. Because of Miller's defiance, each of these less drastic measures failed.

Under the circumstances confronting Deputy Bylsma, use of the police dog was well suited to the task of safely arresting Miller. Deputy Bylsma knew that a trained police dog could be trusted to neutralize the many strategic advantages that Miller had obtained by crouching in the darkness in a remote and unbounded landscape familiar only to Miller and treacherous to others who might enter. Deputy Bylsma knew of the keen nose, acute vision, stealthy speed, natural courage, and lupine strength of the German Shepherd—qualities at the service of the dog's fine instincts and careful training. Deputy Bylsma knew that, despite the darkness, the dog was trained to find, seize, and hold Miller, careful not to hurt Miller more than necessary to disarm, disorient, and restrain him until deputies arrived on the scene seconds later. Deputy Bylsma knew that the dog, trained to obey, would release Miller as soon as Deputy Bylsma determined it was safe and gave the command.[12] He knew that the dog was trained to effect Miller's arrest as safely as possible under the circumstances.[13] In

**12.** It is important that Deputy Bylsma arrived on the scene soon after he heard Miller scream and that Deputy Bylsma commanded Kimon to release Miller as soon as Deputy Bylsma determined that Miller was unarmed. This was good police work, and it showed Deputy Bylsma's desire to minimize harm to the suspect.

**13.** Kimon's contributions as a trained police dog show that Kimon has many of the excellent qualities that have been admired in his species for centuries. These qualities of the species in general, and of Kimon in particular, are relevant because they underscore the value to human society of skilled police dogs. Many of our predecessors on the bench, though writing in different contexts, have recognized the qualities that render reliable and reasonable the use of police dogs in such circumstances as confronted Deputy Bylsma.

The words of some of our predecessor judges bear repeating here, and there is no better place to start than with the Maine Supreme Court's 1884 *Maine v. Harriman* decision, which lauded the noble hound:

> He is the friend and companion of his master—accompanying him in his walks, his servant aiding him in his hunting, The playmate of his children—an inmate of his house, protecting it against all assailants.

75 Me. 562, 566, 1884 WL 2912 (1884).

Perhaps feeling that the Maine Supreme Court's words, though eloquent, did not do the dog justice, the justices of the South Carolina Supreme Court in 1899 paid tribute

> to the noble Newfoundland, that braves the water to rescue the drowning child; to the Esquimaux dog, the burden bearer of the arctic regions; the sheep dog, that guards the shepherd's flocks and makes sheep rais-

ing possible in some countries; to the St. Bernard dog, trained to rescue travelers lost or buried in the snows of the Alps; to the swift and docile greyhound; to the package carrying spaniel; to the sagacious setters and pointers, through whose eager aid our tables are supplied with the game of the season; to the fleet fox hounds, whose music when opening on the fleeing fox is sweet to many ears; to the faithful watch dog, whose honest bark, as Byron says, bays "deep-mouthed welcome as we draw near home;" to the rat-exterminating terrier; to the wakeful fice, which the burglar dreads more than he does the sleeping master; to even the pug, whose very ugliness inspires the adoration of the mistress; to the brag possum and coon dog, for which the owner will fight if imposed upon; and lastly, to the pet dog, the playmate of the American boy, to say nothing of the "yaller dog," that defies legislatures.

Of all animals the dog is most domestic. Its intelligence, docility and devotion make it the servant, the companion and the faithful friend of man.

*State v. Langford*, 55 S.C. 322, 33 S.E. 370, 371 (1899).

The California Court of Appeals weighed in in 1919, noting that "[f]rom the building of the pyramids to the present day, from the frozen poles to the torrid zone, wherever man has wandered there has been his dog." *Roos v. Loeser*, 41 Cal.App. 782, 784, 183 P. 204 (1919). Soon thereafter, the Georgia Supreme Court made its contribution to the judicial literature about the dog:

> In metal and in stone [the dog's] noble image has been perpetuated, but the dog's chief monument is in the heart of his friend, "man." As a house pet, a watchdog, a herder of sheep and cattle, in the field of sport, and as the motive power of transportation, especially in the ice fields of the far north as well as in the Antarctics, the dog has ever been a faithful companion and helper of man.

*Montgomery*, 169 Ga. at 748, 151 S.E. 363.

The United States Court of Claims judges' 1950 paean to the dog is personal and heartfelt:

> In our youth we always had dogs, mostly of the mongrel variety, but nevertheless dogs. We placed them just behind people, and when on rare occasions we fell out with any of our playmates, our hounds usually forged ahead.
>
> We have very little respect and no affection for anyone who has not at some time in

his life loved a dog. Throughout history the dog has been known for his loyalty and faithfulness. He has been celebrated in song and story. Even books have been written about the dog, his character, intelligence and attributes. The dog has been able to awaken affection in the hearts of every race of people. Wherever man has gone, on the frontier, in the great woods, in the frozen north, the faithful dog has been his constant companion, sharing his hardships and his poverty. When in trouble, humanity finds consolation in his company.

> Alcibiades had a handsome dog.
>
> Senator Vest described the dog as "man's best friend."
>
> We meet him first in Homer's verse: "The dog by the Aegean seas."
>
> Scott referred to him as the "companion of our pleasures and our toils," and Mark Twain said the difference between a dog and a man is that "if you pick up a starving dog and make him prosperous, he will not bite you."
>
> It was a dog that licked the wounds of Lazarus in his rags. Rin Tin Tin was a movie star. Neither poverty nor riches, success nor failure, affects his loyalty. It was the dog that served as a test for the army of Gideon. He also performed heroic services in the
>
> most modern and greatest of all wars. The poet said that high in the courts of Heaven the one sure welcome that awaited was a little dog angel that "sits alone at the gates," and would not play with the others until his master arrived.

*Pedersen v. United States*, 115 Ct.Cl. 335, 338 (1950).

Our judicial predecessors' eloquent praise of the dog is matched in the annals of law by attorney (and, later, senator) George Graham Vest's famous closing argument to a jury in an 1872 case involving the illegal shooting of a fabulous hunting dog named "Old Drum." The argument, once memorized by American schoolchildren (a tradition worthy of revival), is known as "Vest's Eulogy to the Dog":

> Gentlemen of the Jury: The best friend a man has in this world may turn against him and become his enemy. His son or daughter that he has reared with loving care may prove ungrateful. Those who are nearest and dearest to us, those whom we trust with our happiness and our good name, may become traitors to their faith. The money that a man has he may lose. It flies away from him, perhaps when he needs it most. A man's reputation may be sacrificed in a moment of ill-considered action.

sum, Deputy Bylsma knew that a police dog's excellent canine qualities were well suited to the important task of capturing a fleeing felon in this ominous setting, a threating landscape that might have filled even staunch human hearts with dread. By contrast, the alternative measures proposed by Miller were utterly unsuited to the task of safely arresting a suspect in this setting. If Deputy Bylsma had wandered blindly into the woods with the dog on a leash, as Miller proposes, Deputy Bylsma might have walked into an ambush. Or Deputy Bylsma might have been pulled by an eager police dog into a dangerous situation with no opportunity to react safely.

If Deputy Bylsma had ordered the dog to release Miller before Deputy Bylsma arrived on the scene, as Miller proposes, Miller might have had a chance to hide or flee anew, to recover a weapon, to harm the dog, or to prepare to launch an ambush against the deputies. Deputy Bylsma was wise not to order the dog to release Miller. Deputy Bylsma's ordering the dog to bite, and hold, Miller was reasonably necessary under the circumstances.

We decide that, under the totality of the circumstances, the government's several strong interests in effecting Miller's seizure through the means chosen outweighed Miller's legitimate interest in not being bitten by a dog. We conclude that Deputy Bylsma's use of a police dog to bite and hold Miller until deputies arrived on the scene less than a minute later was a reasonable seizure that did not violate Miller's Fourth Amendment rights. *Accord Mendoza v. Block,* 27 F.3d 1357, 1362–63 (9th Cir.1994) (holding that police did not violate a suspect's Fourth Amendment rights under the circumstances by ordering a police dog to bite him). Notwithstanding the serious injuries to Miller, there was no use of excessive force under the circumstances.[14]

**AFFIRMED.**

The people who are prone to fall on their knees to do us honor when success is with us may be the first to throw the stone of malice when failure settles its cloud upon our heads. The one absolutely unselfish friend that a man can have in this selfish world, the one that never deserts him, the one that never proves ungrateful or treacherous, is his dog. Gentlemen of the jury, a man's dog stands by him in prosperity and in poverty, in health and in sickness. He will sleep on the cold ground, where the wintry winds blow and the snow drives fierce, if only he may be near his master's side. He will kiss the hand that has no food to offer; he will lick the wounds and sores that come in encounter with the roughness of the world. He guards the sleep of his pauper master as if he were a prince. When all other friends desert he remains. When all riches take wings and reputation falls to pieces, he is as constant in his love as the sun in its journey through the heavens. If fortune drives the master forth an outcast in the world, friendless and homeless, the faithful dog asks no higher privilege than that of accompanying to guard against danger, to fight against his enemies, and when the last scene of all comes, and death takes the master in his embrace and his body is laid away in the cold ground, no matter if all other friends pursue their way, there by his graveside will the noble dog be found, his head between his paws, his eyes sad but open in alert watchfulness, faithful and true even in death.

1943–44 *Official Manual,* State of Missouri 1129.

Truly, we have no finer friend than the dog.

14. Because Miller's Fourth Amendment rights were not violated, we need not and do not decide whether defendant Clark County could be liable for any constitutional violation under *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In addition, we affirm the district court's judgment for the defendants on both of Mil-

ler's state-law claims. We affirm the district court's judgment for the defendants on Miller's assault and battery claim because it falls along with Miller's rejected federal Fourth Amendment claim. *See McKinney v. City of Tukwila,* 103 Wash.App. 391, 13 P.3d 631, 641 (2000) (holding that under Washington law a police officer is liable for assault or battery in effecting an arrest only if the officer used force unreasonable under the United States Constitution's Fourth Amendment). We also affirm the district court's judgment for the defendants on Miller's state-law strict liability claim under Rev.Code Wash. § 16.08.040, which makes a dog owner strictly liable for damages caused by a dog bite, because we conclude that the Washington Supreme Court would hold that a police officer is not liable under Rev.Code Wash. § 16.08.040 for a police dog's bite if the officer's ordering the dog to bite was reasonable under the United States Constitution's Fourth Amendment. *See McKinney,* 13 P.3d at 641. Here, Deputy Bylsma's ordering the police dog to bite and hold Miller did not constitute unreasonable force under the Fourth Amendment, so it also is not actionable under Rev. Code Wash. § 16.08.040.