**Bruce Columbus KYLES, Plaintiff,**

v.

**Aaron BAKER, et al., Defendants.**

**Case No. 13–cv–04695–WHO**

United States District Court,
N.D. California.

Signed October 31, 2014

Russell Alan Robinson, Law Office of Russell A. Robinson, San Francisco, CA, for Plaintiff.

Dale L. Allen, Jr., Kevin Patrick Allen, Allen Glaessner & Werth LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 24

WILLIAM H. ORRICK, United States District Judge

## INTRODUCTION

During an encounter with Pittsburg, California police officers on November 30, 2011, plaintiff Bruce Kyles was forced to the ground, tased multiple times, struck with a flashlight, and mauled by a police dog before being arrested and charged under California Penal Code sections 69 and 148(a)(1). Kyles claims the officers' use of force against him was unprovoked; the officers assert that Kyles was verbally and physically resisting throughout the encounter. After entering a plea of no contest to the section 148(a)(1) charge, Kyles brought a civil rights action against the City of Pittsburg and the arresting officers, alleging unlawful arrest and excessive force under 42 U.S.C. § 1983 and state law causes of action for negligence, assault, and battery. Defendants now move for summary judgment on several grounds, including that under *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Kyles's claims are barred by his section 148(a)(1) conviction. Because I conclude that Kyles's excessive force claims are not barred under *Heck*, and that there are triable issues of fact as to whether the officers are entitled to qualified immunity on these claims, the motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. Officers' Version of Events

Officers Juan Simental, Chunliam Saechao, and Gabriel Palma, the three police officers who participated in Kyles's arrest, testified as follows in their depositions:

On the night of November 30, 2011, Simental was dispatched to 1906 Seward Drive, Pittsburg, California in response to a call reporting a history of suspected drug activity and physical fighting in front of the residence located at that address. Simental Depo. at 12–13 (Allen Decl., Ex. A, Dkt. No. 25). The caller did not report that any criminal conduct was occurring at that moment, only that there had been a number of complaints of suspected criminal conduct at that address in the past. *Id.* When Simental arrived, he observed a brown sedan without license plates parked in the residence's driveway. *Id.* at 13. Two people were sitting in the sedan. *Id.* Simental sent a broadcast over his police radio reporting that he was about to make contact with two individuals. Saechao Depo. at 16 (Allen Decl., Ex. C., Dkt. No 25). As Simental exited his patrol vehicle, a black male, who Simental immediately recognized as Kyles, exited the sedan. Si-

mental Depo. at 14. Simental had arrested Kyles on a prior occasion and "knew he was violent towards police ... [Kyles] is a fighter. He likes to fight the police." *Id.* at 11.

Kyles became combative as soon as he exited the sedan. *Id.* at 14. Kyles repeatedly threatened to fight if Simental attempted to arrest him. *Id.* at 16–17. Kyles "would not stand still." *Id.* at 35. He would walk towards Simental with his fists clenched, then stop and back up, then walk towards Simental again, "all the while yelling profanities" and "challenging [Simental] to a fight." *Id.* at 17, 35. In response to Kyles's demeanor, Simental withdrew his taser from his belt. *Id.* at 17. After Kyles had threatened to fight Simental approximately five times, Simental decided to arrest him for interfering with Simental's investigation of the 1906 Seward Drive residence. *Id.* at 15–16. Simental put his taser away and grabbed Kyles's right arm to arrest him. *Id.* at 57. Kyles resisted, so Simental used a "leg sweep" to force Kyles to the ground. *Id.*

Saechao responded to Simental's broadcast and was the next police officer to arrive on the scene. Saechao Depo. at 16. The first thing Saechao saw as he arrived was Simental and Kyles falling to the ground. *Id.* Saechao was still driving in his vehicle at this point and could not see exactly how or why they fell. *Id.* After Saechao exited his vehicle, he saw Kyles leaning over on his right side and swinging his left arm in Simental's direction without actually making physical contact with Simental. *Id.* at 19. Simental was kneeling next to Kyles and trying to hold him down. *Id.* Saechao ran over and grabbed Kyles's right arm. *Id.* at 23. Kyles was still leaning over on his right side, so his right arm "was kind of underneath him a little bit." *Id.* Saechao "yanked [Kyles's right arm] out from underneath him [and] tried

to place [it] behind his back." *Id.* Kyles continued to resist, and Saechao could not control Kyles's right arm. *Id.* at 25. Simental, who had grabbed Kyles's left arm, also lost control of that arm. *Id.* at 25.

Simental decided to tase Kyles at this point. Saechao Depo. at 25. Simental placed the taser on the middle part of Kyles's back, between his shoulder blades, and deployed the taser without a cartridge, in "contact tase" mode. Simental Depo. at 63–64. Simental tased Kyles five times in quick succession but could not complete a normal, five-second tase because Kyles continued to move around, resisting. *Id.* at 42, 64. Each tase that Simental administered lasted only about one second. *Id.* at 42. After the first tase, Kyles "was jerking his body very violently." Saechao Depo. at 26. Saechao testified at his deposition that Kyles's jerking initially might have been an involuntary reaction to the tase, but that "you regain ... control of your body" once a tase has stopped, and that Kyles became "extremely violent and angry" after the taser was removed from his body. *Id.* at 26, 28. Kyles sat up and began swinging both fists at Simental and Saechao. *Id.* at 27. One of his fists struck Saechao's forehead, breaking the skin and drawing blood. *Id.* at 28–29. Saechao told Kyles multiple times to "stop resisting" and "put his arms behind his back." *Id.* at 40.

Palma and his police dog, Xena, arrived on the scene at about this time. *Id.* at 27–28. Like Saechao, Palma came in response to Simental's radio broadcast. Palma Depo. at 23 (Allen Decl., Ex. E, Dkt. No. 25). Palma was driving a marked K–9 police vehicle that night, and Xena was in the vehicle with him when he received the broadcast. *Id.* at 24. As he pulled up to the 1906 Seward Drive residence, Palma observed Simental and Saechao struggling with Kyles. *Id.* at 27. Palma testified in

**1028**

his deposition that Kyles was laying on his back on the ground with Simental and Saechao kneeling on either side of him. *Id.* at 27. Palma stated that "it looked like Officer Simental [was] attempting to ... dry tase Kyles with a taser [and] Kyles [was] aggressively punching towards the officers." *Id.* at 27. "Dry tase" is another term for "contact tase." *Id.*

Palma decided to deploy Xena. *Id.* at 29. Palma testified that he made this decision because, as he was putting a leash on Xena, he saw that Kyles was now lying on his stomach "with his hands tucked underneath his body toward the midline of his body." *Id.* at 29. Kyles was "not removing his hands from the midline of his body," and Palma feared that Kyles was attempting to retrieve a weapon from that area. *Id.* at 29. Palma admitted in his deposition that he did not see a weapon on Kyles and that neither Simental nor Saechao indicated that Kyles had a weapon. *Id.* at 30.

Xena bit onto Kyles's left leg and continued biting for the next approximately thirty seconds. Palma Depo. at 55–56. During that time, Simental used a flashlight to strike Kyles approximately two times on his left arm in an effort to gain control of that arm, which was still tucked beneath Kyles's body. Simental Depo. at 71–72. Simental then gained control of Kyles's left arm, while Saechao gained control of his right arm. Saechao Depo. at 36. After Kyles was placed in handcuffs, Palma ordered Xena to release Kyles's leg, which she did. Palma Depo. at 55. The officers did not find any weapons or contraband on Kyles after arresting him. Simental Depo. at 71.

Saechao accompanied Kyles to the county hospital in Martinez, California. Saechao Depo. at 43–44. While at the hospital, Kyles spontaneously told Saecho multiple times that he had been unlawful-

ly arrested, and that he had the right to resist an unlawful arrest. *Id.* at 44. According to a declaration submitted by Saechao, Kyles also said that he became "enraged" after he was tased and could not specifically remember what he did, although he did remember that he had fought with the police and that he "could not control himself." Saecho Decl. ¶ 4 (Dkt. No. 28).

### B. Kyles's Version of Events

Kyles's version of events aligns with the officers' in certain ways and varies markedly in others. In a declaration submitted in support of his opposition brief, Kyles states that when he first exited the sedan parked in the driveway at 1906 Seward Drive, Simental had already drawn his firearm and was pointing it at Kyles. Kyles Decl. ¶ 4 (Dkt. No. 37). Simental did not inform Kyles why he was detaining or arresting him, did not ask Kyles whether he was on probation or parole, and did not address Kyles by name. *Id.* Simental told Kyles to "turn the fuck around" and to place his hands on his head. *Id.* Kyles states that he did not threaten Simental or clench his fists; rather, Kyles "asked [Simental] repeatedly why he was coming at me." Id. (internal quotation marks omitted). Although Simental did not respond to Kyles's question, Kyles agreed to walk with him over to the police vehicle. *Id.* Simental then "attacked" Kyles and began to tase him. *Id.*

Kyles states that he was not warned that he was going to be tased. *Id.* ¶ 6. Each time he was tased, he "lost control of [his] limbs and muscles" and "jerked several times involuntarily in response." *Id.* Kyles begged the officers to stop tasing him. He had already submitted to being taken into custody when Xena was deployed. *Id.* ¶ 6–8. Kyles states that "[t]he problem was that [the officers] were al-

most constantly tasing me, causing me to jerk involuntarily in reaction to being tased." *Id.* ¶ 8. Kyles states that he did not strike the officers. *Id.* ¶ 7.

According to Kyles's declaration, he was not warned that Xena was going to be deployed. *Id.* ¶ 9. The declaration states: "Palma never warned me that [the officers] were going to use a police dog against me. No warnings were given. All of a sudden, the dog was ripping at my left leg, causing extreme pain." *Id.* By this time, Kyles "was trying to move [his] arms from underneath [ his] body, but the lasting effect of the taser attacks prevented [ hi m] from being able to move [his] arms because [he] was physically ... exhausted." *Id.* ¶ 9. Kyles states that his only movements while Xena was biting him "were involuntary reactions to the extreme pain in my left leg. I was not kicking at the dog. I was not resisting." *Id.* ¶ 11. As Xena was biting his leg, Kyles heard one of the officers say "something like, 'Good girl.'" *Id.*

At some point during the altercation, there was a knee or foot pressed against the back of Kyles's head, and he was struck on his arm several times with what he believes was a flashlight. *Id.* ¶ 10. Kyles states that he was also struck at least once on his head with an unidentified heavy object. *Id.*

Kyles had several medical procedures performed over the course of the next month. *Id.* ¶ 5 12. Due to the dog bites, he suffered a serious infection and was forced to undergo surgery on his previously damaged right hip. *Id.* Kyles denies the admissions Saechao claims he made while in the hospital. *Id.* ¶ 13. Kyles states that Saechao attempted to initiate conversation with him but that he "just sat and listened to [Saechao] talk." *Id.* Kyles "was in too much pain and was exhausted." *Id.*

## C. Video and Photographic Evidence

Defendants submitted an excerpt from the video recorded during the incident by Simental's taser camera. Allen Decl., Ex. D (Dkt. No. 25). The video is in black and white. During the first thirty to forty seconds, the camera moves around rapidly, and the visual is mostly a blur. There is a continuous crackling and buzzing sound, which defendants describe as the "arc'ing" of Simental's taser. *See, e.g.,* Mot. 3, 15. A voice that appears to belong to Kyles grunts and shouts indistinctly. At approximately fifteen seconds, the voice appears to say, "Come on man, stop."

At approximately forty seconds, the taser is set on the ground and the camera sits still, facing towards a police vehicle parked in the background. The foreground is empty; Kyles and the officers appear to be positioned behind the camera. An officer holding a dog by the leash walks across the screen. The dog barks, and multiple voices begin to shout. Between approximately fifty-three and ninety-eight seconds, different, overlapping voices can be heard repeatedly shouting, "Put your hands behind your back," "Stop resisting," "Good girl," and, "Get it off." The voice that appears to belong to Kyles screams several times during that time span.

In support of his opposition brief, Kyles submitted eleven photographs taken the night of November 30, 2011 after his arrest. Kyles Decl., Exs. 1–11. The photographs depict Kyles lying down, either on the ground or in a hospital bed, and focus mostly on his left leg. The close-ups show a large, ragged hole, approximately six inches across and one inch deep, torn from his calf.

## D. State Court Criminal Proceedings

Based on the November 30, 2011 incident, Kyles was charged in the Superior

Court of California, Contra Costa County, under California Penal Code sections 69 and 148(a)(1). RJN, Exs. A, C (Dkt. No. 29).[1] On April 18, 2012, Kyles entered a plea of no contest to the section 148(a)(1) charge. RJN, Ex C. Section 148(a)(1), a misdemeanor, makes punishable "[e]very person who willfully resists, delays, or obstructs any ... peace officer ... in the discharge or attempt to discharge any duty of his or her office or employment." Cal.Penal Code § 148(a)(1).

## II. PROCEDURAL BACKGROUND

Kyles filed an initial action based on the above-described incident on April 23, 2012 but, for reasons not relevant here, voluntarily dismissed his claims without prejudice on October 9, 2013. *Kyles v. Baker*, No. 12–cv–02016–WHO (N.D. Cal. Apr. 23, 2014), Dkt. Nos. 1, 19. On the same date, Kyles filed the complaint in the instant case. Dkt. No. 1. The complaint names as defendants the City of Pittsburg, the Pittsburg Police Department, Officers Simental, Saechao, and Palma, Sergeant Robert Semas, and Aaron Baker, the former chief of the Pittsburg Police Department. *Id.* The complaint alleges causes of

1. Defendants request judicial notice of the warrant for Kyles's arrest based on the November 30, 2011 incident, the amended information from his subsequent criminal prosecution for violations of sections 69 and 148(a)(1), and documentation of his no contest plea to the section 148(a)(1) charge. Dkt. No. 29. Because these court documents are appropriate subjects of judicial notice under Federal Rule of Evidence 201(b)(2), the request is GRANTED.

2. The complaint alleges causes of action for both unlawful arrest and unreasonable seizure in violation of the Fourth Amendment. As defendants point out in their reply brief, these claims are duplicative. Courts generally treat an unlawful arrest as one manner of violating the Fourth Amendment prohibition on unreasonable seizures. *See, e.g., Myers v. City & Cnty. of San Francisco*, No. 08–cv–01

action under 42 U.S.C. § 1983 for unlawful arrest,[2] excessive force, and conspiracy in violation of the Fourth and Fourteenth Amendments and asserts that defendants committed their constitutional violations pursuant to a municipal policy, practice and/or custom. The complaint also includes state law tort claims for negligence, assault, and battery. On October 16, 2014, Kyles voluntarily dismissed with prejudice the Pittsburg Police Department, Sergeant Robert Semas, and Aaron Baker, as well as his claims for conspiracy and violation of the Fourteenth Amendment. Dkt. No. 48. Kyles left intact his Fourth Amendment and state law tort claims against the City of Pittsburg, Simental, Saechao, and Palma.

Defendants filed their summary judgment motion on September 17, 2014. Dkt. No. 24. I heard argument from the parties on October 22, 2014.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is

163–MEJ, 2012 WL 4111912, at *4 n. 12 (N.D.Cal. Sept. 18, 2012) ("There are sufficient facts in the record that may lead a rational juror to conclude that [defendant] was involved in [plaintiff's] alleged unlawful arrest, which would constitute a Fourth Amendment violation for an unreasonable seizure."); *Elkins v. Washington Cnty.*, No. 06–cv–00448, 2007 WL 1342155, at * 5 (D.Or. May 3, 2007) ("A false or unlawful arrest is treated as a claim of unreasonable seizure of the person through the Fourth Amendment to the United States Constitution."). Kyles does not explain in either his complaint or his brief why he has alleged claims for both unlawful arrest and unreasonable seizure. Accordingly, for the purposes of this motion, I consider Kyles's unlawful arrest and unreasonable seizure claims under a single, "unlawful arrest" analysis.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it could reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material where it could affect the outcome of the case. *Id.*

The party moving for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has made this showing, the burden shifts to the nonmoving party to identify specific evidence showing there is a genuine issue of material fact for trial. *Id.* If the nonmoving party cannot do so, the movant "is entitled to ... judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Id.* (internal quotations omitted).

On summary judgment, the court draws all reasonable factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738–39 (9th Cir.1979).

## DISCUSSION

## I. EVIDENTIARY OBJECTIONS

Federal Rule of Civil Procedure 56(c)(2) allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissi-

ble in evidence." Fed. R. Civ. P. 56(c)(2). Defendants object to three declarations submitted by Kyles in support of his opposition to defendants' summary judgment motion. Kyles objects to two exhibits submitted by defendants.

### A. Declaration of Bruce C. Kyles

■ Defendants argue that certain portions of Kyles's declaration should be stricken under the "sham affidavit rule." Reply 12–13. Defendants base this argument on *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262 (9th Cir.1991), in which the Ninth Circuit stated that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Id.* at 266. The court in *Kennedy* went on to hold, however, that this general rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Id.* at 266–67. Before striking a contradictory affidavit, "the district court must make a factual determination that the contradiction was actually a sham." *Id.* at 267. (internal quotation marks omitted).

■ Since *Kennedy,* the Ninth Circuit has imposed a second requirement for application of the sham affidavit rule: that the inconsistency between the party's prior deposition testimony and his subsequent affidavit be "clear and unambiguous." *Van Asdale v. Int'l Game Tech.,* 577 F.3d 989, 998–99 (9th Cir.2009). "[M]inor inconsistences that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 999. The Ninth Circuit has also instructed that the sham affidavit rule "should be applied with caution," because "aggressive invocation of the rule ... threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing at-

torneys." *Id.* at 998; *see also, Yeager v. Bowlin,* 693 F.3d 1076, 1080 (9th Cir.2012) ("[T]he sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment.") (internal quotation marks omitted).

██ Application of the sham affidavit rule is not warranted here. Defendants assert the following inconsistencies in Kyles's declaration: (1) Paragraph 4 of the declaration includes additional information not included in Kyles's deposition testimony—for example, the assertion that Simental did not ask Kyles whether he was on probation or parole. Kyles Decl. ¶ 4; Kyles Depo. at 32–34.(2) Kyles's statement in his declaration that he begged the officers to stop tasing him contradicts his deposition testimony that he "really can't remember" everything about what happened when he was being tased and that "it was really fuzzy." Kyles Decl. ¶ 6; Kyles Depo. at 40.(3) Kyles's claim in his declaration that he had submitted to being taken into custody when Xena was deployed contradicts his deposition testimony that "the whole incident" was about the officers "trying to get me into a position where I was submissive." Kyles Decl. ¶¶ 8–9, 11; Kyles Depo. at 50.(4) Kyles's denial in his declaration that he made admissions to Saechao while in the hospital "violates the spirit of the sham affidavit rule" because Kyles is "taking a statement he made … and attempting to retract it." Reply 12–13.

None of these inconsistencies are sufficiently "clear and unambiguous" to justify striking Kyles's declaration or any portion of it. The additional information contained in the declaration is minor, Kyles's statement that he "really can't remember" everything about what happened when he was being tased is not inconsistent with his subsequent revelation of additional minor details, and it is not clear from the deposition transcript what Kyles was attempting to convey when he stated that the incident was about the officers "trying to get me into a position where I was submissive." As to the inconsistency between Saechao's and Kyles's testimony regarding what was said at the hospital, defendants have not presented any authority for applying the sham affidavit rule to an inconsistency between deposition testimony and an alleged unsworn statement. *See Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir.1999) ("This is different, however, from our sham affidavit cases, because plaintiff's] deposition testimony and sworn declaration in this case are consistent and are contradicted only by [his] unsworn letters."). Kyles's credibility is a question for the jury, not me. Defendants' sham affidavit objections to Kyles's declaration are OVERRULED.

██ On the other hand, defendants' objection to paragraph 14 of Kyles's declaration, in which Kyles states that he was induced to plead no contest to violating section 148(a)(1) by misrepresentations from the district attorney and public defender's offices, is GRANTED. This information is not relevant to the validity of Kyles's claims against defendants. *See, e.g., Wetter v. City of Napa,* No. 07–cv–04583–WHA, 2008 WL 62274, at *4 (N.D.Cal. Jan. 4, 2008) (disregarding plaintiff's argument that *Heck* should not bar his unlawful arrest claim because of the circumstances of his no contest plea under section 148(a)(1); stating that "whether the plea was coerced or breached is not before this Court").

## B. Declarations of Barry Brodd and Richard Polsky

In support of his opposition brief, Kyles submitted declarations by expert witnesses Barry Brodd and Richard Poslky. Brodd is a former police officer and current ex-

pert and consultant in the fields of law enforcement, police officer defensive tactics, police officer safety, and police officer use of force. Brodd Decl. ¶¶ 2–3. Polsky is an expert in animal behavior. Polsky Decl. ¶ B (Dkt. No. 35). Because I do not rely on either the Brodd or the Polsky declaration to resolve this motion, I decline to rule on defendants' objections at this time.

## C. Documents Regarding Kyles's Administrative Claim

Defendants submitted two exhibits regarding the administrative claim filed by Kyles with the City of Pittsburg in connection with the November 30, 2011 incident. The first exhibit is the claim itself, the attached proof of service, and the envelope in which the documents were delivered to the City. Allen Decl., Ex. F (Dkt. No. 25). The second exhibit is the "Notice of Untimely Claim" sent by the City to Kyles informing him that his claim was not timely presented. *Id.* at Ex. G. Defendants offer the exhibits to show that Kyles failed to comply with the claim presentment requirements of the California Tort Claims Act, and that his state law tort claims are barred as a result. *See* Mot. 24–25. Kyles objects that the exhibits are hearsay, that Kevin Allen, the author of the declaration to which the exhibits are attached, lacks personal knowledge, and that Allen's description of the exhibits lacks foundation. Opp. 15 n.3

Based on my conclusion, discussed in detail below, that the City's "Notice of Untimely Claim" failed to comply with the California Tort Claims Act and that defendants therefore waived any timeliness defense to Kyles's administrative claim, these objections are OVERRULED AS MOOT.[3]

---

3. On October 22, 2014, the same day as the hearing on this motion, Kyles filed an additional brief asserting several evidentiary objections which were not raised in Kyles's opposition. Dkt. No. 52. These objections are OVERRULED. First, they are in plain violation of Civil Local Rule 7–3(a), which requires that any evidentiary or procedural objections to a motion be contained within the opposition brief. Civ. L.R. 7–3(a). Second, they are meritless. Kyles objects to Saechao's declaration testimony that while at the hospital following the November 30, 2011 incident, Kyles said he became "enraged" after he was tased and could not specifically remember what he did, although he did remember fighting with the police and not being able to control himself. *See* Saechao Decl. ¶¶ 3–4. Kyles argues this testimony is inadmissible under the hearsay rule and under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The hearsay objection fails because of the opposing party statement exception to the hearsay rule. *See* FRE 801(d)(2) (a statement is not hearsay where it "is offered against an opposing party and ... was made by the party in an individual or representative capacity"). The *Miranda* objection fails for any number of reasons, including that this is a civil case, not a criminal prosecution. *See Hanson v. Dane Cnty., Wis.,* 608 F.3d 335, 339 (7th Cir.2010) (noting that "the results of interrogation without *Miranda* warnings are admissible in civil cases.").

Kyles also argues that evidence of his no contest plea and conviction should be excluded as irrelevant because, in light of the fact that he has filed a habeas petition in state court, the conviction "is not final" and therefore does not act as a bar under *Heck.* Kyles does not cite any authority in support of this proposition, and it is wrong. A conviction may act as a bar under *Heck* so long as it has not been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck,* 512 U.S. at 487, 114 S.Ct. 2364. In other words, the conviction must have "already been invalidated." *Id.*; *see also, Rodriguez v. Kwok,* No. 13–cv–04976–SI, 2014 WL 2110256, at * 2 n. 1 (N.D.Cal. May 20, 2014) ("[T]he mere filing of a habeas petition is insufficient to overcome the *Heck* bar, as *Heck* requires that the conviction or sentence already be invalidated."). At most, the fact of Kyles's pending state habeas petition is grounds for abstention until the petition is resolved. *See Heck,* 512 U.S. at 487 n. 8, 114 S.Ct. 2364 (noting in dicta that "if a

## II. UNLAWFUL ARREST

■ Defendants contend that Kyles's unlawful arrest claim is barred under *Heck*, according to which a plaintiff may not prevail on a section 1983 claim if doing so "would necessarily imply the invalidity" of an extant conviction arising out of the same underlying facts as the civil action. 512 at 487. "*Heck*, in other words, says that if a criminal conviction stands and is fundamentally inconsistent with the unlawful behavior for which section 1983 damages are sought, the 1983 action must be dismissed." *Smithart v. Towery,* 79 F.3d 951, 952 (9th Cir.1996). Defendants are correct.

■ Kyles's plea of no contest to California Penal Code section 148(a)(1) qualifies as a conviction under *Heck.* Although the Ninth Circuit has not squarely addressed this issue in a published opinion, the court has repeatedly treated no contest pleas in California state court as convictions when applying the *Heck* doctrine. *See Szajer v. City of Los Angeles,* 632 F.3d 607, 609–12 (9th Cir.2011); *Ove v. Gwinn,* 264 F.3d 817, 823 n. 4 (9th Cir.2001); *see also, Radwan v. Cnty. of Orange,* 519 Fed. Appx. 490, 490–91 (9th Cir.2013) ("We have repeatedly found *Heck* to bar section 1983 claims, even where the ... prior convictions were the result of guilty or no contest pleas."). Courts in this district have likewise concluded that no contest pleas are convictions for *Heck* purposes. In *Wetter v. City of Napa,* the court examined the exact same question raised by this case—i.e., whether a plea of no contest to California Penal Code section 148(a)(1) acts as a bar to a subsequent section 1983 claim. 2008 WL 62274, at *2–3. The

state criminal defendant brings a federal civil-rights lawsuit during the pendency of his criminal trial, appeal, or state habeas action, abstention may be an appropriate response to the parallel statecourt proceedings."). Because neither party has requested abstention,

court concluded that it does. *Id.* The court reasoned: "The purpose of the *Heck* doctrine is to ensure that valid state criminal convictions and sentences are not, in effect, retroactively contradicted by subsequent federal civil actions. That purpose applies to any conviction whether by guilty plea or nolo contendre plea." *Id.* at *3. Likewise, in *Webb v. City & Cnty. of San Francisco,* No. 11–cv00476–CRB, 2011 WL 6151605 (N.D. Cal. Dec. 12, 2011), the court held that a no contest plea in California state court "has the same effect as a guilty plea or other conviction for the purposes of applying the *Heck* doctrine." *Id.* at *6. Kyles's argument that his no contest plea is not cognizable as a conviction under *Heck* is not supported by case law or other authority, and it fails.

■ The next step in the *Heck* analysis is whether a favorable ruling on Kyles's unlawful arrest claim would necessarily imply the invalidity of his conviction under section 148(a)(1). *See Heck,* 512 U.S. at 487, 114 S.Ct. 2364. This issue has also been repeatedly and consistently addressed by courts in this circuit. The court in *Wetter* held that the plaintiff's unlawful arrest claim was barred by his section 148(a)(1) conviction because under California law, a section 148(a)(1) conviction requires that the arresting officer was acting lawfully at the time of the arrest. 2008 WL 62274, at *3; *see also Susag v. City of Lake Forest,* 94 Cal.App.4th 1401, 1409, 115 Cal.Rptr.2d 269 (2002) ("In California, the lawfulness of an arrest is an essential element of the offense of resisting or obstructing a peace officer. If the

I do not consider whether it would be appropriate here. I conclude only that evidence of Kyle's no contest plea and conviction remains relevant to this case, and that his conviction may operate to bar certain of his claims under *Heck.*

officer was not performing his or her duties at the time of the arrest, the arrest is unlawful and the arrestee cannot be convicted under [section 148(a) ].") (internal citations omitted). An officer only acts lawfully at the time of arrest where the arrest is supported by probable cause. *Wetter,* 2008 WL 62274, at *4; *see also, Mong Kim Tran v. City of Garden Grove,* No. 11–cv–01236, 2011 WL 5554370, at *3 (C.D.Cal. Nov. 14, 2011) ("Probable cause is a necessary element [under] section 148(a)(1)."). Thus, a finding that the plaintiff's arrest was unsupported by probable cause, as would be required for the plaintiff to prevail on his unlawful arrest claim, would necessarily imply the invalidity of the plaintiff's section 148(a)(1) conviction in direct contravention of *Heck. Wetter,* 2008 WL 62274, at *4.

Likewise, in *Mong Tim Kran v. City of Garden Grove,* the court concluded that *Heck* barred the plaintiff's false arrest claim following his section 148(a)(1) conviction because "in order to prevail on a section 1983 claim for false arrest ... [plaintiff] would have to demonstrate that there was no probable cause to arrest him. Such a result would invalidate the conviction, which *Heck* clearly prohibits." 2011 WL 5554370, at *3; *see also, Smithart,* 79 F.3d at 952 ("There is no question that *Heck* bars [plaintiff's claims] that defendants lacked probable cause to arrest him ... [Plaintiff] may challenge the validity of his arrest ... only by writ of habeas corpus.").

Kyles has not presented any contrary authority, and, indeed, presents virtually no argument in his opposition brief in support of his unlawful arrest claim. *See* Opp. at 11–12, 14. Because it is barred by *Heck,* defendants are entitled to summary judgment on this cause of action.

## III. EXCESSIVE FORCE

### A. Kyles's excessive force claims are not barred under *Heck.*

Defendants argue that *Heck* also bars Kyles's excessive force claims. The argument is based on the law that an officer only acts lawfully at the time of arrest, as required for a conviction under section 148(a)(1), where the officer uses no more than reasonable force to overcome any resistance and complete the arrest. *See Hooper v. Cnty. of San Diego,* 629 F.3d 1127, 1130 (9th Cir.2011); *see also, Rodriguez v. City of Modesto,* 535 Fed.Appx. 643, 644 (9th Cir.2013) (noting that, for the purposes of section 148(a)(1), "a police officer is not lawfully performing her duties if she arrests an individual without probable cause, or uses unreasonable or excessive force on the individual at the time the [individual's] unlawful resistance, delay or obstruction is occurring") (internal citations omitted). In certain circumstances, an excessive force claim brought under section 1983 may threaten the validity of a section 148(a)(1) conviction and be prohibited under *Heck.* "The relevant question is whether success in [the] section 1983 suit would 'necessarily imply' or 'demonstrate' the invalidity of the earlier conviction." *Beets v. Cnty. of Los Angeles,* 669 F.3d 1038, 1046 (9th Cir.2012) (quoting *Heck,* 512 U.S. at 487, 114 S.Ct. 2364).

Two recent Ninth Circuit cases, *Hooper v. Cnty. of San Diego* and *Beets v. Cnty. of Los Angeles,* help define the boundary between an excessive force claim arising from the same factual circumstances as a section 148(a)(1) conviction that is barred by *Heck,* and one that is' not.

In *Hooper,* the Ninth Circuit held that *Heck* does not bar recovery where the section 148(a)(1) conviction and the section 1983 excessive force claim "are based on different actions during one continuous transaction." 629 F.3d at 1134 (internal

quotation marks omitted). Hooper was detained by a private security officer on suspicion of shoplifting from a Long's Drugs. *Id.* at 1129. She was calm and compliant when the arresting officer arrived, and she gave the officer her car keys so that he could search her car. *Id.* When the officer discovered a crystalline substance he believed to be methamphetamine in the car, he grabbed Hooper by the wrist and told her she was under arrest for possession. *Id.* Hooper jerked her hand away from the officer, and in the ensuing struggle, Hooper ended up on the ground, lying on her stomach, with the officer on top of her. *Id.* The officer then called for his police dog, which bit Hooper's head once, lost its hold, then bit her head again and held it until the officer's backup arrived. *Id.* Hooper pled guilty to violating section 148(a)(1). *Id.* In the section 1983 action for excessive force that followed, the district court granted summary judgment for defendants on the ground that *Heck* barred Hooper's excessive force claims. *Id.*

The Ninth Circuit reversed. The court reasoned that a section 148(a)(1) conviction does not necessarily bar all excessive force claims arising from the same underlying incident because "[i]t is sufficient for a valid conviction under section 148(a)(1) that at some time during a continuous transaction an individual resisted, delayed, or obstructed an officer when the officer was acting lawfully. It does not matter that the officer might also, at some other time during that same continuous transaction, have acted lawfully." *Id.* at 1132. Accordingly, so long as the excessive force claim is "based on different actions" than the section 148(a)(1) conviction, the claim is not barred by *Heck*, even where the claim and the conviction arise from the same "continuous transaction." *Id.* at 1134. In such situations, "two isolated factual contexts [ ] exist, the first giving rise to criminal liability on the part of the

criminal defendant, and the second giving rise to civil liability on the part of the arresting officer." *Id.* at 1132 (internal quotation marks and emphasis omitted). Applying this rule to the facts of Hooper's case, the court concluded that the district court erred in granting summary judgment for the defendants because "[a] holding in Hooper's section 1983 case that the use of the dog was excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of Hooper's attempt to resist it when she jerked her hand away from [the officer]." *Id.* at 1133.

In *Beets*, decided just one year after *Hooper*, the Ninth Circuit affirmed the district court's dismissal under *Heck* of a section 1983 excessive force suit. 669 F.3d at 1042–48. The action was brought by the parents of a man who was shot and killed by a sheriff's deputy. *Id.* at 1040. The man's accomplice had been tried and convicted of aiding and abetting in the assault of a peace officer with a deadly weapon, an offense which, like section 148(a)(1), requires a finding that the officer was "lawfully performing his duties" and not "using unreasonable or excessive force." *Id.* at 1045. The deputy shot the man as he and his accomplice, in their attempt to flee from the authorities, rapidly backed a pickup truck in the deputy's direction, causing him to fear for his life. *Id.* at 1040. The accomplice's conviction for aiding and abetting in the assault of a peace officer with a deadly weapon was based on this use of the pickup truck. *Id.* at 1043.

The parents argued that there were "several possible factual bases for [the accomplice's] conviction and that therefore [her] conviction [was] not necessarily based on the same factual basis as the alleged civil rights violations." *Id.* at 1045. The Ninth Circuit disagreed, reasoning

that "there was no separation" between the conduct that gave rise to the accomplice's conviction and "the alleged use of excessive force." *Id.* at 1045–46. The court also emphasized that a jury verdict, unlike a plea, "necessarily determines the lawfulness of the officers' actions throughout the whole course of the defendant's conduct," so that a subsequent section 1983 excessive force action brought by the defendant "would necessarily imply the invalidity of his conviction." *Id.* at 1045 (internal quotation marks omitted). Since *Beets,* at least two judges in this district have held that a section 148(a)(1) conviction obtained by jury verdict barred a subsequent section 1983 action for excessive force. *See Lozano v. City of San Pablo,* No. 14–cv–00898–KAW, 2014 WL 4386151, at *6 (N.D.Cal. Sept. 4, 2014) ("The jury verdict in the state court proceedings brings this case squarely in line with *Beets.*"); *Tarantino v. City of Concord,* No. 12–cv–00579–JCS, 2013 WL 3722476, at *3 (N.D.Cal. July 12, 2013) (holding that plaintiff's convictions at trial for assault on a peace officer and violation of section 148(a)(1) barred plaintiff's excessive force claims where the jury made special findings that plaintiff "initiated a physical altercation" with the officers and "did not act in self-defense").

■ Defendants are wrong that the instant case is analogous to *Beets.* Kyles was convicted by a plea of no contest, not by a jury trial. His conviction thus did not "necessarily determin[e] the lawfulness of the officers' actions throughout the whole course of [ his] conduct." *Beets,* 669 F.3d at 1045.[4] Rather, this is a case, like *Hooper,* where different actions occurred during the course of one continuous transaction. It is not clear from the record which of those actions provided the factual basis for Kyles's conviction under section 148(a)(1). Although defendants submitted several documents concerning Kyles's criminal charges and plea, none of the documents reveal the factual basis for his conviction. *See* RJN, Exs. A–C. The mere fact that Kyles pled no contest to a section 148(a)(1) charge does not automatically imbue every aspect of the officers' conduct during the November 30, 2011 encounter with an irrebuttable presumption of lawfulness. The question remains whether it is reasonable to infer that Kyles's section 148(a)(1) conviction and his excessive force claims are "based on different actions." *Hooper,* 629 F.3d at 1134.

That inference is reasonable. Viewing the evidence in the light most favorable to the nonmoving party, the encounter between Kyles and the officers appears to involve "two isolated factual contexts ..., the first giving rise to criminal liability on the part of [Kyles], and the second giving rise to civil liability on the part of the arresting officer[s]." *Id.* at 1132 (internal

---

**4.** At least one Ninth Circuit judge has criticized the distinction drawn in *Beets* between convictions by plea and convictions by jury verdict, observing that it does not make sense to assume that a guilty jury verdict "necessarily determines the lawfulness" of an officer's actions throughout the course of his encounter with a section 1983 plaintiff unless the jury was "actually ... instructed that, to convict, it had to find that the office[r] acted lawfully throughout the whole course of [the] encounter." *Wilson v. City of Long Beach,* 567 Fed.Appx. 485, 486–88 (9th Cir.2014) (Watford, J., dissenting). Even apart from the fact that the underlying conviction in this case was by plea instead of jury verdict, this case is also distinguishable from *Beets* because, in that case, "there was no separation" between the conduct that gave rise to the conviction—I.e., the rapid backing up of the pickup truck—and the alleged use of excessive force. 669 F.3d at 1045–46. Here, in contrast, it is reasonable to infer that Kyles's initial combative demeanor gave rise to his section 148(a)(1) conviction, while the officers' alleged use of excessive force occurred thereafter.

quotation marks omitted). According to Simental's deposition testimony, Simental's determination that Kyles had violated section 148(a)(1) was based exclusively on Kyles's combative demeanor upon exiting the sedan, not on any aspect of the subsequent physical altercation. Simental Depo. at 15–16. Indeed, Simental testified that he decided to arrest Kyles for violating section 148(a)(1) before any physical contact had occurred—it was only because of Simental's attempt to arrest Kyles that the physical altercation between Kyles and the officers began in the first place. *Id.* It is thus reasonable to infer that Kyles's section 148(a)(1) conviction was based wholly on his initial obstruction of Simental's lawful investigation of the 1906 Seward Drive residence, and that a finding that the officers subsequently used excessive force against Kyles would in no way imply the invalidity of the conviction. In these circumstances, *Heck* is no bar to an excessive force claim.

### B. Whether the officers' use of force was reasonable is a question for the jury.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The gravity of a particular intrusion on an individual's Fourth Amendment interests depends on "the type and amount of force inflicted." *Chew v. Gates,* 27 F.3d 1432, 1440 (9th Cir.1994). Factors relevant to the governmental interests at stake include: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* This list is not exhaustive; for example, in certain cases, "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." *Id.* at 1440 n. 5.

The inquiry is an objective one, meaning that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865; *see also, Chew,* 27 F.3d at 1440 ("[T]he reasonableness of a seizure must ... be assessed by carefully considering the objective facts and circumstances that confronted the arresting officer or officers."). Because application of this reasonableness test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment ... in excessive force cases should be granted sparingly." *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (9th Cir.2003) (internal quotation marks omitted); *see also, Chew,* 27 F.3d at 1440 ("[T]he propriety of a particular use of force is generally an issue for the jury."). That said, a defendant police officer "can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Liston v. Cnty. of Riverside,* 120 F.3d 965, 981 n. 10 (9th Cir.1997).

I cannot say at this juncture that the officers' use of force against Kyles was objectively reasonable as a matter of law. According to Kyles's version of events, when Kyles, unarmed, exited the sedan, Simental had already drawn his firearm and was pointing it at him. Kyles Decl. ¶ 4. Simental told Kyles to "turn the fuck around" and to place his hands on his

head. *Id.* Kyles offered brief, verbal resistance and then agreed to walk with Simental to the police vehicle. *Id.* As Kyles did so, Simental "attacked" Kyles, forced him to the ground, and, without warning, began tasing him. *Id.* Kyles begged Simental to stop, but Simental continued tasing hi m, causing Kyles to jerk uncontrollably. *Id.* ¶ 6–8. Palma deployed Xena, who began "ripping" at Kyles's leg, tearing a large hole in his left calf. *Id.* ¶ 9. One of the officers repeatedly said, "Good girl," while Kyles shouted, "Get it off!" *Id.* ¶ 11. Although Kyles's only physical movements during this time were involuntary responses either to the tasings or to the extreme pain caused by Xena's biting, Simental struck Kyles twice with a flashlight, an officer pressed a knee or foot against the back of Kyles's head, and an officer struck Kyles's head with an unidentified heavy object. *Id.* ¶ 10.

Based on these facts, a reasonable juror could find that the officers' use of force was excessive. Kyles identifies five instances of allegedly excessive force used against him: (i) Simental's "initial attack from behind;" (ii) the approximately five tasings deployed by Simental against his back; (iii) Xena's biting of his left leg; (iv) the flashlight strikes against his arm; and (v) the blow to his head with an unidentified heavy object. Opp. 12. Although not all of these intrusions are particularly severe, the governmental interests at stake were minimal. Viewed in the light most favorable to Kyles, the evidence indicates that the officers were faced with an unarmed individual whose only suspected crime was obstructing Simental's investigation of the 1906 Seward Drive residence and who was not resisting, either verbally or physically, at the time the force was used against him. Accordingly, a reasonable juror could conclude that the intrusion on Kyles's Fourth Amendment interests caused by each of the five uses of force, gauged by the type and amount of force

inflicted, far outweighed the governmental interests at stake. *See Blankenhorn v. City of Orange,* 485 F.3d 463, 478–480 (9th Cir.2007) (reasonable juror could find that officers used excessive force by "gang tackling" plaintiff and then punching him, where plaintiff was suspected only of misdemeanor trespass and was not actively resisting at time of gang tackle); *Sayavanh v. City of Tukwila,* No. 11–cv–00038, 2012 WL 1022912, at *6–8 (W.D.Wash. Mar. 23, 2012) (reasonable juror could determine that officer's "unprovoked" shoving of plaintiff to the ground constituted excessive force); *Josfan v. Indochine,* No. 09–cv–07904, 2012 WL 113371, at *9–10 (C.D.Cal. Jan. 13, 2012) (plaintiff raised triable issue on whether officers used excessive force, where undisputed facts showed that officers "physically grabbed plaintiff, forced him to the ground, and handcuffed him," and plaintiff testified that he was not resisting); *Newman v. San Joaquin Delta Cmty. Coll. Dist.,* No. 09–cv–0344, 2010 WL 2179964, at *4 (E.D.Cal. May 27, 2010) ("Taking [the] allegations as true, [the officer] used unreasonable force against [plaintiff] by dragging him to the ground and pinning him there because [plaintiffs] posed no danger to the officers, did nothing to provoke them, and there was no severe crime at issue."). This is especially so with regard to the tasings and the dog bite. *See Brooks v. City of Seattle,* 661 F.3d 433, 446 (9th Cir.2011) (reasonable juror could find excessive force where officer contact tased plaintiff three times over the course of one minute after plaintiff, who had been pulled over and issued a speeding citation, "actively resisted arrest [by] refus[ing] to get out of her car when instructed to do so and stiffen[ing] her body and clutch[ing] her steering wheel to frustrate the officers' efforts to remove her from her car"); *Watkins v. City of Oakland, Cal.,* 145 F.3d 1087, 1093 (9th Cir.1998) (holding, in case where po-

lice dog bit plaintiff for approximately fifteen seconds in officer's presence, that "excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force"). Kyles has raised genuine issues of fact regarding the reasonableness of the force used against hi m, and the officers are not entitled to summary judgment on this ground.

### C. Saechao may be held liable for Simental and Palma's use of excessive force.

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir.2000). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *United States v. Koon,* 34 F.3d 1416, 1447 n. 25 (9th Cir.1994), *rev'd on other grounds,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Thus, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 207 n. 3 (1st Cir.1990). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham,* 229 F.3d at 1289. "A police officer cannot be held liable for failing to intercede if he has no realistic opportunity to prevent an attack." *Gaudreault,* 923 F.2d at 207.

Kyles has not presented evidence that Saecho inflicted any of the five instances of excessive force that Kyles alleges were used against him. The record indicates that Simental forced Kyles to the ground, tased him, and struck him with the flashlight, and that Palma made the decision to deploy Xena. *See, e.g.,* Simental Depo. at 57, 63–64, 71–72; Palma Depo. at 27–28. The one alleged use of force that is unaccounted for in the record is the blow to Kyles's head with the unidentified heavy object. While neither Simental nor Palma testified to doing this, there is no indication either that Saecho did it.

On the other hand, Saecho testified that he was the second officer to arrive on the scene. Saecho Depo. at 16. His testimony indicates that for most of the incident, including during most if not all of the tasings and throughout the dog bite, he was kneeling over Kyles, in close proximity both to Simental and to where Xena was biting Kyles's leg. The video submitted by defendants shows that the physical altercation between Kyles and the officers lasted for at least ninety seconds. Allen Decl., Ex. D. Viewing these facts in the light most favorable to Kyles, it is reasonable to infer that this amount of time, combined with Saechao's proximity to the alleged misconduct, provided Saecho with a realistic opportunity to intercede. *Contrast with, Gaudreault,* 923 F.2d at 207 n. 3 (no realistic opportunity to intercede where "the attack came quickly and was over in a matter of seconds"); *Mendez v. Montour,* No. 12–cv–04170–WHO, 2014 WL 1218665, at *1–4 (N.D.Cal. Mar. 21, 2014) (no realistic opportunity to intercede where excessive force claim was based on other officer's act of suddenly and unexpectedly knocking plaintiff to ground and then slamming plaintiff's head against the police vehicle). Kyles may maintain his excessive force claims against Saechao.

### D. The officers are not entitled to summary judgment based on qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). This "requirement ... does not mean that the very action at issue must have been held unlawful before qualified immunity is shed." *Blankenhorn*, 485 F.3d at 481. On the contrary, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Gravelet–Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir.2013) (internal quotation marks omitted). "But while there need not be a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted). Where, as here, there exist genuine issues of material fact regarding the constitutional violation in question, "summary judgment is appropriate only if defendants are entitled to qualified immunity on the facts as alleged by the nonmoving party." *Blankenhorn*, 485 F.3d at 477.

Summary judgment is not appropriate here. In *Blankenhorn v. City of Orange*, after holding that there was a triable issue as to whether the defendant officers used excessive force by "gang tackling" and punching the plaintiff, the Ninth Circuit concluded that the officers were not entitled to qualified immunity. 485 F.3d at 480–81. The court reasoned that in determining whether the rights at issue were clearly established at the time of the underlying incident,

we need look no further than *Graham*'s holding that force is only justified when there is a need for force. We conclude that this clear principle would have put a prudent officer on notice that gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect—especially one who had been cooperative in the past and was at the moment not actively resisting arrest—was a violation of that person's Fourth Amendment rights. This same principle would also adequately put a reasonable officer on notice that punching [plaintiff] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was also a Fourth Amendment violation.

*Id.* at 481.

Under *Blankenhorn*, the acts of forcing Kyles to the ground, striking him with a flashlight, and hitting him with another heavy object, if proven at trial, constituted violations of Kyles's clearly established Fourth Amendment rights. It is true that Kyles has not presented evidence that he had been cooperative with the officers in the past—indeed, the only relevant evidence in the record indicates just the opposite. *See* Simental Depo. at 11 ("I knew [Kyles] was violent towards police ... [Kyles] is a fighter. He likes to fight the police."). But the facts of this case are otherwise analogous. According to Kyles's version of events, which must be credited as true for the purposes of this analysis, he was, like the plaintiff in *Blankenhorn*, "relatively calm" and "not actively resisting" when Simental forced him to the ground. Kyles was then struck several times despite his only movements being not attempts to resist, but involuntary reactions triggered by the tasings and the pain of Xena's biting. *Blankenhorn*, and the

Fourth Amendment principles described therein, put the officers on notice that a calm and nonresisting suspect such as Kyles could not constitutionally be forced to the ground and repeatedly struck. *See also, Sayavanh,* 2012 WL 1022912, at *8 ("[Plaintiff] had a clearly established right to be free from allegedly unprovoked force by being shoved to the ground."); *Newman,* 2010 WL 2179964, at *5 (E.D.Cal. May 27, 2010) ("[A]ny reasonable officer would know that he or she does not have the right to drag a person to the ground and pin that person there in the absence of flight, provocation, or other exigent circumstances.").

By the date of the incident, November 30, 2011, it was also clearly established law that a taser, even in "contact tase" mode, could not be lawfully deployed against an individual acting as Kyles contends he was. In *Brooks v. City of Seattle,* issued on October 17, 2011, the Ninth Circuit held that a juror could reasonably find excessive force where an officer contact-tased the plaintiff three times over the course of one minute after she "actively resisted arrest [by] refus[ing] to get out of her car when instructed to do so and stiffen[ing] her body and clutch[ing] her steering wheel to frustrate the officers' efforts to remove her from her car." 661 F.3d at 446. The plaintiff, who was pregnant at the time, was pulled over and issued a citation for speeding but refused to sign the citation or exit her vehicle. *Id.* at 436-37. After learning that the plaintiff was pregnant and attempting but failing to forcibly remove her from her vehicle, the officer tased her once on her left thigh, once her on left arm, and once on her neck, at which point she collapsed and was dragged out of the vehicle. *Id.* at 437. The court applied the *Graham* factors and concluded that a reasonable fact-finder could find excessive force because:

> [Plaintiff's] alleged offenses were minor. She did not pose an immediate threat to the safety of the officers or others. She actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car. [Plaintiff] did not evade arrest by flight, and no other exigent circumstances existed at the time. She was seven months pregnant, which the officers knew, and they tased her three times within less than one minute, inflicting extreme pain.

*Id.* at 445-46.

*Brooks* put the officers on notice that the use of a taser against Kyles was unconstitutional in the circumstances as Kyles recounts them. As in *Brooks,* Kyles's alleged offense—i.e., obstructing Simental's investigation of the 1906 Seward Drive residence—was minor. Kyles was initially verbally combative, but he was unarmed and by the time any force was applied against him, he was calm and compliant. Kyles Depo. ¶ 4. Kyles did not attempt to evade arrest by flight, and the record does not contain evidence of other exigent circumstances compelling the officers to use a greater than usual amount of force against him. Kyles was tased five times in a short time span, causing him to lose control of his muscles, spasm involuntarily, and beg for the tasing to stop. *Id.* ¶ 6-8. While Kyles was not pregnant, the plaintiff's pregnancy in *Brooks* does not appear to be a dispositive factor in the court's analysis. Moreover, according to Kyles's testimony, unlike the plaintiff in *Brooks,* he was not in any way resisting when the allegedly excessive force was used against him. Kyles Depo. ¶ 4.

Finally, if Kyles's version of events is proven at trial, a juror could reasonably conclude that the deployment of Xena violated clearly established law. *See Wat-*

*kins,* 145 F.3d at 1093 (holding that in 1998 the law was "clearly established that excessive duration of [a police dog] bite and improper encouragement of a continuation of the attack by officers could constitute excessive force"); *Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir.1994) ("We do not believe that a more particularized expression of the law is necessary for law enforcement officials using police dogs to understand [than] that under some circumstances the use of such a 'weapon' might become unlawful. For example, no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control.").

Defendants rely on *Miller v. Clark Cnty.,* 340 F.3d 959 (9th Cir.2003), for the proposition that the law regarding the deployment of Xena against Kyles was not clearly established on November 30, 2011, but that reliance is misplaced. In *Miller,* the police dog was only deployed after the officers "had attempted several less forceful means" to arrest Miller, including signaling with emergency lights and sirens for him to stop his car, pursuing his car in a police vehicle, pursuing him on foot, and warning him that if he did not surrender a police dog would be sent to capture him. *Id.* at 966. By the time the dog was released, Miller was "crouching in the darkness in [ an] unbounded landscape familiar only to Miller and treacherous to others who might enter." *Id.* at 967. The court also found it "important that [the officer] arrived on the scene soon after he heard Miller scream and that [the officer] commanded [the dog] to release Miller as soon as [the officer] determined that Miller was unarmed." *Id.* at 968. Here, in contrast, a juror could reasonably conclude that Kyles neither resisted nor attempted to evade arrest, that he was not positioned in a "treacherous landscape" when Xena

was deployed against hi m, and that the officers allowed Xena to continue biting for longer than necessary. Given these factual differences, *Miller* does not support the officers' assertion that qualified immunity applies here.

Kyles has presented sufficient evidence to raise triable issues as to whether the officers are entitled to qualified immunity. Accordingly, the officers' request for summary judgment on this ground is denied.

## IV. MONELL LIABILITY

Because Kyles has not presented sufficient evidence to create a triable issue as to whether the City of Pittsburg may be held liable for Kyles's alleged constitutional injuries, the City is entitled to summary judgment on the section 1983 cause of action.

■■■■ A municipal entity may not held liable under section 1983 for the unconstitutional acts of its employees on a theory of respondeat superior. *Connick v. Thompson,* 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011). Under *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality may only be held liable under section 1983 where the constitutional violation was caused by the municipality's policy, custom, or practice. *Id.* at 690–91, 98 S.Ct. 2018. "[I]t is not enough for a section 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Bd. of Cnty. Commis. of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (internal quotation marks omitted). *Monell* limits municipal liability to instances where the plaintiff's claims are based on one of three theories: (1) that the alleged

constitutional injury was "committed … pursuant to a formal governmental policy or a longstanding practice or custom;" (2) "that the individual who committed the constitutional tort was an official with final policymaking authority;" or (3) "that an official with final policymaking authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (internal quotation marks omitted).

Kyles appears to assert two theories of *Monell* liability against the City: first, that a final policymaker ratified the officers' use of excessive force against Kyles; and second, that there is a "longstanding de facto policy" of deploying police dogs without first issuing a warning to the target suspect. Opp. 15. Both theories fail.

 To prove *Monell* liability based on ratification, the plaintiff must show that the final policymaker in question had "knowledge of the constitutional violation and actually approve[d] of it. A mere failure to overrule a subordinate's actions, without more, is insufficient to support a section 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir.2004). The final policymaker's response to the subordinate's unconstitutional conduct must amount to more than acquiescence; he or she must have affirmatively approved both the subordinate's decision and the basis for it. *Gillette*, 979 F.2d at 1348.

 Kyles does not point to any evidence showing who the relevant final policymakers were on November 30, 2011, or whether they knew and approved of the allegedly excessive force used against him. *See* Opp. 15. The extent of Kyles's ratification evidence appears to be a November 30, 2011 memorandum from "Sergeant R.

Semas" to "Lieutenant M. Perry" describing the encounter between Kyles and the arresting officers. *See* Robinson Decl., Ex. 3 (Dkt. No. 38–1). There is no evidence in the record that either Semas or Perry had "final policymaking authority" on November 30, 2011. Even if one of them did, Kyles has not offered any basis for concluding that either the creation or the receipt of the memorandum, standing alone, amounts to the affirmative approval of his alleged constitutional injury.

 Kyles's assertion that there is a "longstanding de facto policy" of deploying police dogs without first issuing a warning to the target suspect is also an insufficient basis for imposing *Monell* liability against the City. Although it is unclear whether Kyles means to assert the existence of a formal municipal policy or, rather, an informal municipal custom, the distinction is irrelevant here because Kyles has not produced sufficient evidence of either. Apart from his own encounter with Xena, Kyles's only evidence of the alleged "de facto policy" is Simental's deposition testimony that, during the year that Simental and Palma rode together in Palma's K–9 vehicle, Xena was deployed in pursuit of suspects approximately fifty times.[5] Simental Depo. at 66–69 (Robinson Decl., Ex. 6, Dkt. No. 38–6). Simental states that he does not recall a warning being given in connection with any of those prior deployments. *Id.* However, Simental also states that Xena did not make physical contact with any of the suspects she was deployed against. *Id.* To the best of Simental's knowledge, Kyles was the first suspect that Xena ever bit, and Kyles has not presented evidence indicating otherwise.

The November 30, 2011 incident and Simental's deposition testimony, without

---

5. The declaration of Kyles's animal behavior expert, Richard Polsky, is focused exclusively on Xena's biting of Kyles and does not include information regarding Xena's prior deployments or the City's policies or customs concerning police dogs. *See* Polsky Decl. ¶¶ A–E.

more, are not sufficient to show unconstitutional policy or custom under *Monell*. Kyles has not presented direct evidence of a formalized policy, and the facts he has asserted do not give rise to an inference that one exists. *See Waggy v. Spokane Cnty. Washington*, 594 F.3d 707, 713 (9th Cir.2010) (upholding grant of summary judgment for county on plaintiff's *Monell* claims where plaintiff "point[ed] to no express county policy" and "provid[ed] no evidence showing even an inference that such a [policy] exists").

▮▮▮▮▮ As to the existence of an informal custom, municipal liability on such a theory "must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996). Accordingly, "[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident or unconstitutional action by a nonpolicymaking employee." *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir.2001). "Only if a plaintiff shows that his injury resulted from a permanent and well-settled practice may liability attach for injury resulting from a local government custom." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir.1989). "[E]vidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded" may support a finding of municipal liability. *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir.2011). But "[w]hen one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom." *Trevino*, 99 F.3d at 920.

Simental's deposition testimony, which concerns only one police officer's handling of one police dog and reveals nothing about the specific circumstances of any of the police dog's prior deployments, is not enough to satisfy this standard. This is especially so in light of the testimony that Xena never made physical contact with a suspect during her prior deployments. No Ninth Circuit case holds that it is a per se constitutional violation to deploy a police dog without warning, even where the police dog does not make physical contact with the suspect. Rather, Ninth Circuit precedent indicates that as a general matter, "warnings should be given, when feasible, if the use of force may result in serious injury," *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir.2001), and that in analyzing the reasonableness of a police dog seizure, the presence or absence of a warning is "just one factor of many," *McKay v. City of Hayward*, 949 F.Supp.2d 971, 983–84 (N.D.Cal.2013) (reviewing Ninth Circuit police dog cases). Testimony that Xena had been deployed approximately fifty times, without additional information regarding the specific circumstances of those deployments, is not enough to show the sort of "repeated constitutional violations" necessary to impose *Monell* liability for improper custom.

## V. STATE LAW TORT CLAIMS

### A. California Tort Claims Act

Kyles's third and fourth causes of action allege negligence, assault, and battery against all defendants. Compl. ¶¶ 42–55. Defendants argue that these causes of action are barred because Kyles failed to file a timely administrative claim with the City of Pittsburg as required under the California Tort Claims Act ("CTCA"). Mot. 24–25. The argument is without merit because defendants, by failing to comply with the CTCA themselves, have waived their right to a timeliness defense.

The CTCA provides that a plaintiff may not maintain a personal injury action against a public entity unless he first presents his claim to the entity within six months of the date of accrual of the cause of action. Cal. Gov. Code §§ 911.2, 945.4; *see also, Mangold v. California Pub. Utilities Comm'n,* 67 F.3d 1470, 1477 (9th Cir. 1995) ("The [CTCA] requires, as a condition precedent to suit against a public entity, the timely presentation of a written claim and the rejection of the claim in whole or in part."). Under the CTCA, the date of accrual is "the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no requirement that a claim be presented to and be acted upon by the public entity before an action could be commenced thereon." Cal. Gov. Code § 901. In California, tort claims generally accrue on the date the tortious conduct occurs. *See Butler v. Los Angeles Cnty.,* 617 F.Supp.2d 994, 1002 (C.D.Cal.2008); *Gallardo v. DiCarlo,* 203 F.Supp.2d 1160, 1169 (C.D.Cal.2002).

Kyles's cause of action against defendants accrued on November 30, 2011, meaning that Kyles had until May 30, 2011 to file an administrative claim with the City. A claim is considered filed on the date the claimant deposits it in the mail. Cal. Gov. Code § 915.2. Kyles asserts in his opposition brief that he complied with the CTCA by depositing his claim in the mail on May 30, 2011. Opp. 15–16. In support, Kyles points to his claim, which is dated May 30, 2011, and the attached proof of service, which is also dated May 30, 2011. Allen Decl., Ex. F. Kyles also alleges in his complaint that he "was required [under the CTCA] to file claims and did file said claims within six months of November 30, 2011." Compl. ¶ 43.

Defendants assert that Kyles's administrative claim was in fact mailed on May 31,

2011, one day after the six-month deadline. Mot. 24–25. In support, defendants point to the envelope in which Kyles's claim was mailed, which is postmarked May 31, 2011. Allen Decl., Ex. F. Defendants contend that "this tardiness bars [Kyles's] state law claims." Mot. 24–25.

Defendants also point to a "Notice of Untimely Claim" dated June 12, 2012 and addressed from the City of Pittsburg to Kyles's attorney. Allen Decl., Ex. G. The notice states:

> The claim you presented against the City of Pittsburg on June 1, 2012 is being returned because it was not presented within … six months after the event or occurrence as required by law. Because the claim was not presented within the time allowed by law, no action was taken on the claim. The City has no authority to take action on any claim presented more than one year after the event or occurrence.
>
> The late claim procedure cannot be invoked on behalf of claims that are late under the one-year rule. The court is without jurisdiction to grant leave to file a late claim against the government if application is filed more than one-year after accrual of a cause of action.
>
> You may seek advice of an attorney of your choice, at your own cost, in connection with this matter. If you desire to consult an attorney, you should do so immediately.

*Id.* (internal citations omitted). Defendants assert, and Kyles does not dispute, that Kyles did not respond to the notice. Mot. 25.

The notice cites to four sections of the California Government Code, sections 901, 911.2, 911.3, and 911.4. Allen Decl., Ex. G. Section 901 defines the date on which a cause of action begins to accrue, i.e., the date the statute of limitations begins to run. Cal. Gov. Code § 901. Section 911.2

provides the basic rule that "[a] claim related to a cause of action ... for injury to person ... shall be presented ... not later than six months after the accrual of the cause of action." Cal. Gov. Code § 911.2. Section 911.4 allows a claimant who has missed the six-month filing deadline to make a written application to the public entity for leave to present the untimely claim. The application must be made within one year of the accrual date of the cause of action. Cal. Gov. Code § 911.4(b). There is no indication that Kyles filed an application pursuant to section 911.4.

Under section 911.3(a), where a public entity receives an untimely claim, the entity has 45 days to provide written notice to the claimant that his claim was not timely filed and that it is "being returned without further action." Cal. Gov. Code § 911.3(a). The statute directs that the written notice "shall be in substantially the following form":

> The claim you presented to the (insert title of board or officer) on (indicate date) is being returned because it was not presented within six months after the event or occurrence as required by law. Because the claim was not presented within the time allowed by law, no action was taken on the claim.
>
> Your only recourse at this time is to apply without delay to (name of public entity) for leave to present a late claim. Under some circumstances, leave to present a late claim will be granted. You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.
>
> *Id.* (internal citations omitted).

Section 911.3(b) provides that if the public entity fails to provide written notice to the claimant as required by section 911.3(a), "any defense as to the time limit for presenting a claim ... is waived." Cal. Gov. Code § 911.3(a); *see also, Phillips v. Des-*

*ert Hosp. Dist.,* 49 Cal.3d 699, 711, 263 Cal.Rptr. 119, 780 P.2d 349 (1989) ("[A]s it failed to notify plaintiffs of any timeliness defects (§ 911.3, subd. (a)), the hospital has ... waived any defenses it might have raised on the ground of plaintiffs' asserted failure to present a timely claim (§ 911.3, subd. (b)).").

■ The reason that defendants have waived a timeliness defense here is that the notice sent to Kyles does not comply with section 911.3(a). The notice completely omits the second paragraph of the exemplary language provided in the statute. Instead of stating that "[y]our only recourse at this time is to apply without delay ... for leave to present a late claim" and that "[u]nder some circumstances, leave to present a late claim will be granted," the notice states that the City "has no authority to take action on any claim presented more than one year after the event or occurrence" and that "[t]he late claim procedure cannot be invoked on behalf of claims that are late under the one-year rule." Allen Decl., Ex. G. Rather than informing the recipient of the statutorily-provided avenue for late-claim relief, the language in the City's section 911.3(a) notice creates the impression that late-claim relief is not possibly available.

Strictly speaking, the City's section 911.3(a) notice is correct. Section 911.4 requires that an application for leave to present an untimely claim be filed within one year of the accrual date of the cause of action. Thus, a public entity cannot "take action on any claim presented" after the one-year deadline has passed because "[t]he late claim procedure" has closed. Allen Decl., Ex. G. But this information, while technically accurate, is delivered in the notice in such a way as to create the false impression that the recipient has already missed his opportunity to seek leave to present a late claim. The notice thus

fails to "substantially follow" the form prescribed by section 911.3(a). Under section 911.3(b), the consequence of this failure is waiver of "any defense as to the time limit for presenting a claim." Cal. Gov. Code § 911.3(a); *see also, Phillips,* 49 Cal.3d at 711, 263 Cal.Rptr. 119, 780 P.2d 349.

At the hearing on October 22, 2014, I granted defendants' request for leave to submit supplemental briefing on this issue, and defendants filed a supplemental brief on October 24, 2014. Dkt. No. 57. The additional arguments contained therein are not convincing. First, defendants emphasize that California courts apply a "substantial compliance" doctrine when construing the CTCA. *Id.* at 2–3. While this is true, defendants do not present a single California case applying the "substantial compliance" doctrine to a section 911.3(a) notice. *See id.* If anything, defendants' emphasis on "substantial compliance" cuts against their position, because, as defendants point out, California courts generally apply the doctrine in the name of effectuating the CTCA's purpose, which is "to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation." *Stockett .v. Ass'n of California Water Agencies Joint Powers Ins. Auth.,* 34 Cal.4th 441, 446, 20 Cal.Rptr.3d 176, 99 P.3d 500 (2004). The California Supreme Court has cautioned that because the administrative claim requirement is designed "to give the government entity notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions, the [ CTCA] should not be applied to snare the unwary where its purpose has been satisfied." *Id.; see also, Sykora v. State Dep't of State Hospitals,* 225 Cal.App.4th 1530, 1536, 171 Cal.Rptr.3d 583 (2014) ("The Legislature recognized that claimants make mistakes during the claims pro-

cess and must be given an opportunity to correct them. Consequently, it . . . granted courts authority to apply the substantial compliance doctrine."). The substantial compliance doctrine provides more support for the notion that a California court would excuse Kyles's failure to submit a timely claim than that one would find the City's notice adequate under section 911.3(a).

Second, defendants point to a recent case from this district which found that a section 911.3(a) notice was adequate despite using language significantly different from that provided in the statute. *See Navarro v. City of Alameda,* No. 14–cv–01954–JD, 2014 WL 4744184, at *3 (N.D.Cal. Sept. 22, 2014). The notice in that case stated:

> The claim you presented to the City of Alameda on February 19, 2014 is being returned because it was not presented within six months after the event or occurrence as required by law. The alleged incident . . . occurred on July 27, 2012. Because this claim was not presented within the time allowed by law, no action is being taken on the claim. Although a claimant may apply to the City for leave to present a late claim, such application for late claim relief must be presented no later than one year after the accrual of the cause of action. Therefore, such application for late claim relief in this case would be untimely as well.
>
> *Navarro,* No. 14–cv–01954–JD (N.D.Cal. Apr. 29, 2014), Dkt. No. 12 (internal citations omitted).[6]

The court held that this notice adequately complied with section 911.3(a) because it "gave plaintiff proper notice of the defects in [his] claim" and "advised him that the claim was late and that any application to present a late claim would be futile." *Na-*

---

6. Defendants' request for judicial notice of this document is GRANTED.

*varro,* 2014 WL 4744184, at \*3. Defendants contend that the City's section 911.3(a) notice is similar to the one held adequate in *Navarro.*

The crucial difference between *Navarro* and the instant case is evident on the face of the notice sent to the plaintiff in *Navarro.* There, the plaintiff submitted his untimely claim more than a year after the alleged incident on which the claim was based. There was thus no reason for the City to inform the plaintiff that his "only recourse at this time is to apply without delay . . . for leave to present a late claim" and that "[u]nder some circumstances, leave to present a late claim will be granted." Cal. Gov. Code § 911.3(a). Under section 911.4, the plaintiff was already barred from seeking late claim relief. Here, on the other hand, Kyles submitted his untimely claim well within one year of its date of accrual, meaning that under section 911.4, Kyles was still entitled to an opportunity to file an application for leave to present his untimely claim. In light of this difference, *Navarro* does not support defendants' contention that the City's section 911.3(a) notice is adequate under the statute.

Finally, defendants cite to *Rason v. Santa Barbara City Housing Authority,* 201 Cal.App.3d 817, 247 Cal.Rptr. 492 (1988), which noted that the "[y]our only recourse" language in a section 911.3(a) notice can be misleading because, where a claimant wishes to dispute a public entity's determination of untimeliness, the claimant must do so by filing a civil lawsuit, not by seeking late claim relief under section 911.4. *Id.* at 827–28, 247 Cal.Rptr. 492. This case does not support the position that a section 911.3(a) notice need not contain the "[y]our only recourse" language or its substantial equivalent. The case merely observes one misleading aspect of the language; it does not mandate or excuse the language's complete omission. Indeed, the case even notes that the "[y]our only

recourse" warning "is required by statute." *Id.* at 828, 247 Cal.Rptr. 492.

Because the "Notice of Untimely Claim" failed to comply with section 911.3(a), the dispute over the date on which Kyles submitted his administrative claim is moot. Any objection to Kyle's administrative claim for lack of timeliness has been waived, and the CTCA is not a bar to his state law causes of action.

### 2. *Heck* Analysis

Defendants next assert that Kyles's state law tort claims are barred by the California equivalent to the *Heck* doctrine. Although *Heck* "is a rule of federal law that applies only to federal causes of action," the California Supreme Court has held that *Heck* analysis "applies equally" to tort claims arising from state law. *Yount v. City of Sacramento,* 43. Cal.4th 885, 902, 76 Cal.Rptr.3d 787, 183 P.3d 471 (2008); *see also, Villegas v. City of Colton,* No. 09–cv–00644, 2010 WL 5252721, at \*5 (C.D.Cal. Dec. 9, 2010) ("Like [plaintiff's] section 1983 claims for excessive force, his assault and battery claims are barred by the *Heck* doctrine."); *Baldacchino v. Cnty. of El Dorado,* No. 01–cv–01910, 2009 WL 3246451, at \*5 (E.D.Cal. Oct. 6, 2009) ("Plaintiff also asserts state law claims for assault and battery. The principles established by *Heck* apply to both those claims").

Like Kyles's excessive force cause of action, his negligence and assault and battery causes of action do not necessarily arise from the same "factual context" as his conviction under California Penal Code section 148(a)(1). *See Hooper,* 629 F.3d at 1134. For this reason, they do not threaten the validity of that conviction and are not barred under the California analog to *Heck* analysis.

### 3. Merits

Defendants argue that the state law tort claims fail on their merits because the force used by the officers against Kyles was reasonable as a matter of law. Mot. 25; Reply 11. This argument fails for the same reason it fails as applied to Kyles's excessive force claims. *Young v. Cnty. of Los Angeles,* 655 F.3d 1156, 1170 (9th Cir. 2011) (holding that "the Fourth Amendment violation alleged by [plaintiff] also suffices to establish the breach of a duty of care under California law"); *Brown v. Ransweiler,* 171 Cal.App.4th 516, 527, 89 Cal.Rptr.3d 801 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable."). Material factual disputes remain as to whether the officers' use of force against Kyles was reasonable. Whether that use of force amounted to negligence, assault, or battery is a question for the jury.

## VI. PUNITIVE DAMAGES

 Kyles seeks punitive damages. "[A] jury may be permitted to assess punitive damages in an action under section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). California law conditions punitive damages on the plaintiff proving "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ.Code § 3294(a). "Malice" in this context includes the "willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1). The evidence in this case is sufficient to raise a triable issue as to the state of mind of each officer during the November 30, 2011 incident. Defendants are not entitled to summary judgment on the issue of punitive damages.

## CONCLUSION

For the reasons discussed above, the motion is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to the unlawful arrest and unreasonable seizure causes of action, and as to all claims for *Monell* liability against the City. It is DENIED as to the excessive force cause of action and the state law tort claims.

**IT IS SO ORDERED.**